## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARK MILANO, ROBERT CAMERON, RODNEY HERGENRADER, KATHERINE H. JONCAS and CHARLES VAN HOOSER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, THE BOARD OF DIRECTORS OF COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, THE 401(K) INVESTMENT COMMITTEE OF COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION and JOHN DOES 1-30.<br><br>Defendants. | CIVIL ACTION NO.:<br><br>**2:20-cv-17793** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Mark Milano, Robert Cameron, Rodney Hergenrader, Katherine H. Joncas and Charles Van Hooser ("Plaintiffs"), by and through their attorneys, on behalf of the Cognizant Technology Solutions 401(k) Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Cognizant Technology Solutions U.S. Corporation.

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

("Cognizant" or "Company") and the Board of Directors of Cognizant Technology Solutions U.S. Corporation and its members during the Class Period[2] ("Board") and the 401(k) Investment Committee of Cognizant Technology Solutions U.S. Corporation and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

3.    The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.    The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

5.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In

---

[2] The putative Class Period (defined below) is December 2, 2014 through the date of judgment.

devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

9.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

10.     At all times during the Class Period (December 2, 2014 through the date of judgment) the Plan was one of the largest in America.  As of year end 2014, the Plan had 410 million dollars in assets under management.  At the end of 2017 and 2018, the Plan had over 1 billion dollars and 1.1 billion dollars, respectively, in assets under management.  And as of year-end 2022, the Plan had $2.2 billion in assets under management.

11.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  For example, in 2017 only 0.1 percent (695 of 569,257) of 401(k) plans in the country were as large as the Plan.[4] And in 2019, only 0.1 percent (776 of 603,217) of plans in the country had more than $1 billion in assets under management.[5]

12.     As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

13.     The Plan is also large in terms of the number of its participants.  From 2014 to 2022, the number of Plan participants grew each year from 18,979 in 2014 to 92,372 in 2022. For comparison, in 2020, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the DOL by retirement plans, there were only 125 defined contribution plans (401k, 401a, and 403b) in the country with over 50,000 participants with account balances.

---

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017 at Ex. 1.2, p. 13., available at
https://www.ici.org/system/files/attachments/20_ppr_dcplan_profile_401k.pdf.

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

14.    As of the end of 2022, there were only 47 (forty-seven) 401(k) retirement plans with 90,000 or more participants and 41 (forty-one) 401(k) plans with 100,000 or more participants.

15.    Accordingly, the Plan had substantial bargaining power to negotiate favorable recordkeeping and administration fees. Plans, such as the Plan, with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

16.    Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and/or performance; (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping and administrative ("RKA") costs.

17.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

18.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

20.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

21.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    PARTIES

**<u>Plaintiffs</u>**

22.    Plaintiff, Mark Milano ("Milano"), resides in Brick, New Jersey. During his employment, Plaintiff Milano participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit. Specifically, Plaintiff Milano invested in the American Century One Choice 2025 target date fund ("American Century Target Date Fund"). A target date fund is designed to provide a single diversified investment vehicle for plan participants. The target date refers to the participant's expected retirement year. For example, "target date 2030" investments are designed for individuals who intend to retire in 2030.

23.    Mr. Milano suffered injury to his Plan account due to significant underperformance of the American Century target dates, including the 2025 fund. Mr. Milano suffered further injury to his Plan account by being overcharged for his share of RKA costs.

24.     Plaintiff, Robert Cameron ("Cameron"), resides in El Dorado Hills, California. During his employment, Plaintiff Cameron participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit. Specifically, Plaintiff Cameron invested in the American Century One Choice 2040 target date fund and suffered injury to his Plan account due to significant underperformance of the American Century target dates, including the 2040 fund. Mr. Cameron suffered further injury to his Plan account by being overcharged for his share of RKA costs.

25.     Plaintiff, Rodney Hergenrader ("Hergenrader"), resides in Denver, Colorado. During his employment, Plaintiff Hergenrader participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit. Specifically, Plaintiff Hergenrader invested in the American Century One Choice 2025 target date fund and suffered injury to his Plan account due to significant underperformance of the American Century target dates, including the 2025 fund. Mr. Hergenrader suffered further injury to his Plan account by being overcharged for his share of RKA costs.

26.     Plaintiff, Katherine H. Joncas ("Joncas"), resides in Grafton, Massachusetts. During her employment, Plaintiff Joncas participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit. Specifically, Plaintiff Joncas invested in the American Century One Choice 2050 target date fund and suffered injury to her Plan account due to significant underperformance of the American Century target dates, including the 2050 fund. Ms. Joncas suffered further injury to her Plan account by being overcharged for her share of RKA costs.

27.     Plaintiff, Charles Van Hooser ("Hooser"), resides in Jacksonville, Florida. During his employment, Plaintiff Hooser participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit. Specifically, Plaintiff Hooser invested in the

American Century One Choice 2025 target date fund and suffered injury to his Plan account due to significant underperformance of the American Century target dates, including the 2025 fund. Mr. Hooser suffered further injury to his Plan account by being overcharged for his share of RKA costs.

28.     Each Plaintiff has standing to bring this action on behalf of themselves and the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

29.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available identical funds, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

30.     Cognizant is the Plan sponsor and a named fiduciary with a principal place of business at 500 Frank W. Burr Boulevard, Teaneck, New Jersey 07666.  The December 31, 2018 Form 5500 of the Cognizant Technology Solutions 401(k) Savings Plan filed with the United States Department of Labor ("2018 Form 5500") at 1.

31.     Cognizant describes itself as one "of the world's leading professional services companies, transforming clients' business, operating and technology models for the digital era." The December 31, 2019 10-k filed with the United States Securities and Exchange Commission ("10-k") at 1. Cognizant reports that it had "approximately 292,500 employees at the end of 2019 … ." 10-k at 5. At the end of 2019, Cognizant reported over 16 billion dollars in revenue. 10-k at 17.

32.     The Company, acting through its Board of Directors, appointed the Committee which is responsible "for the investment of Plan assets … in any prudent investment consistent with the funding policy of the Plan and the requirements of ERISA." The Massachusetts Mutual Life Insurance Company Volume Submitter Profit Sharing/401(k) Plan as amended and restated effective May 1, 2020 ("Plan Doc.") at 110.

33.     Accordingly, the Company had a concomitant fiduciary duty to monitor and supervise those appointees.

34.     Cognizant also made discretionary decisions to make profit sharing and employer matching contributions to the Plan each year. As detailed in the 2018 Auditor Report: "Under the terms of the plan agreement, contributions to the Plan by the Company are on a discretionary basis." The December 31, 2018 Report of the Independent Auditor of the Cognizant Technology Solutions 401(k) Savings Plan ("2018 Auditor Report") at 6.

35.     Accordingly, Cognizant during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over management or disposition of Plan assets and because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

36.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

37.    As detailed above, the Company, acting through its Board of Directors, appointed the Committee which is purportedly responsible "for the investment of Plan assets … in any prudent investment consistent with the funding policy of the Plan and the requirements of ERISA." Plan Doc at 110. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees. As will be discussed below, the Committee failed to carry out its fiduciary duties prudently.

38.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets and because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

39.    The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

40.    As discussed above, the Committee is responsible "for the investment of Plan assets … in any prudent investment consistent with the funding policy of the Plan and the requirements of ERISA." Plan Doc. at 110. The Committee must "act for the exclusive benefit of the Plan Participants and Beneficiaries." Plan Doc. at 117. The Committee must also "establish a funding policy and method for the Plan for purposes of ensuring the Plan is

satisfying                                    its                                    financial

objectives." The Committee is also responsible for selecting and monitoring the investments in

the Plan. Plan Doc. at 112. As will be discussed in more detail below, the Committee fell well

short of these fiduciary goals.

41.     The Committee and each of its members were fiduciaries of the Plan during the

Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because

each exercised discretionary authority over management or disposition of Plan assets.

42.     The Committee and unnamed members of the Committee during the Class Period

(referred to herein as John Does 11-20), are collectively referred to herein as the "Committee

Defendants."

### Additional John Doe Defendants

To the extent that there are additional officers, employees and/are contractors of Cognizant who

are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager

for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs,

Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the

instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are

not limited to, Cognizant officers, employees and/or contractors who are/were fiduciaries of the

Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class

Period.

### IV.    CLASS ACTION ALLEGATIONS [6]

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

43.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between December 2, 2014 through the date of judgment (the "Class Period").

44.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 lists 39,958 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at 2.

45.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

46.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are/were fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duty of prudence by
>
>        engaging in the conduct described herein;

---

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.      Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

D.      The proper form of equitable and injunctive relief; and

E.      The proper measure of monetary relief.

47.      Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

48.      This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

49.      In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.      THE PLAN

50.     Cognizant adopted the Plan "…to help its employees save for retirement." The Summary Plan Description of the Cognizant Technology Solutions 401(k) Savings Plan effective August 1, 2020 ("SPD") at 1.

51.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 109. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

*Eligibility*

52.     In general, regular full-time employees are eligible to participate in the Plan. 2018 Auditor Report at 6. The 2018 Auditor Report states: "[t]he Plan is a defined contribution plan covering substantially all employees of Cognizant Technology Solutions" *Id.*

*Contributions*

53.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

54.     With regard to employee contributions: participants may contribute between 1% to 75% of pretax annual compensation, as defined in the Plan." *Id.* As discussed above, Cognizant may decide to make matching contributions to the Plan in any given year. *Id.* As

described in the 2018 Auditor Report: "[f]or the year ended December 31, 2018, the Company matched                                                                                        50% of employee contributions, up to 6% of eligible compensation deferred each pay period to the Plan.." *Id.*

56.     Like other companies that sponsor 401(k) plans for their employees, Cognizant enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

56.     Cognizant also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

57.     Given the size of the Plan, Cognizant likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

58.     Participants are immediately vested in both their own contributions made to the Plan but also any contributions matched by the Cognizant. As described in the 2018 Auditor Report: "[p]articipants are vested immediately in their contributions as well as employer match contributions plus actual earnings thereon." *Id*.

### *The Plan's Investments*

59.     In theory, the Committee responsibilities include selection and monitoring of the funds available for investment in the Plan.  Plan Doc. at 112.  The Committee must carry out this

fiduciary responsibility "for the exclusive benefit of the Plan Participants and Beneficiaries." Plan Doc. at 117.  But in practice, as alleged below, that is not what happened.

60.    Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee. Plan Doc. at 109.

61.    The Plan's assets under management for all funds as of December 31, 2018 was $1,172,609,167.  2018 Auditor Report at 4.

### Payment of Plan Expenses

62.    During the Class Period, administrative expenses were paid for using Plan assets. As described in the Plan Document: "All reasonable expenses related to plan administration will be paid from Plan assets … ." Plan Doc. at 118.

## VI.    THE TOTALITY OF CIRCUMSTANCES DEMONSTRATES THAT THE PLAN'S FIDUCIARIES FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    Overview

#### 1.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology for Evaluating Investments

63.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

64.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

65.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

66.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Defendants to request, among other things, the Committee's meeting minutes.  This request was made on August 17, 2020. By letter dated November 16, 2020, Cognizant denied Plaintiffs' request for meeting minutes.

67.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

68.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors.

69.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of

the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

70.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

71.    Acting in the sole interest of plan participants is all encompassing.  A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

72.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

73.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

74.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

75.     The specific methodologies used to select prudent investments are primarily data driven.  Such data is provided by investment research companies like Morningstar, which is the most accepted source of investment performance information, as it has the most robust information on mutual funds, CITs, and other types of investments.  Indeed, Morningstar is used and trusted by virtually all financial professionals and fiduciaries.

76.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

77.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.")

78.     Lastly, to the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

79.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

**B.      The Target Tate Funds in the Plan**

80.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's American Century Target Date Funds.

81.     During the Class Period, the American Century Target Date Funds materially underperformed when compared to its benchmarks and peers costing the Plan tens of millions of dollars in lost returns.

82.     Beginning in 1994, the market for target date funds exploded with numerous investment managers offering a variety of different target date funds.

83.     By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

84.     Established target date investment managers include, but are not limited to, American Funds, MFS Lifetime, MoA Clear Passage, Callan Glidepath and The T.Rowe Price Retirement target date series which will all be referred to as the "Comparator Funds."   Each of these funds are placed in the same Morningstar peer grouping.

85.     As can be seen in the attached exhibits A-J, the American Century Target Date Funds underperformed the Comparator Funds each year from 2014 through 2023 while also underperforming its Morningstar benchmark for the majority of the Class Period.  The total amount of underperformance was one hundred million dollars.

**C.     Four of the Plan's Funds with Substantial Assets had Identical Lower Cost Alternatives**

86.     Here, Defendants failed to timely consider available lower cost identical mutual funds to the funds offered by MassMutual. The alternative funds are identical in every respect except that they don't bear the MassMutual name. MassMutual engages in a rebranding process whereby it contracts with providers of mutual funds to offer each provider's funds but only as a MassMutual product.

87.    MassMutual refers to their branded funds as separate investment accounts ("SIA"). A review of the Menu of Available Investment Options published by MassMutual in 2018 provides the following statement regarding SIAs offered by MassMutual: "MassMutual also maintains multiple SIAs or sub-accounts of SIAs that invest in the same share class of a mutual fund, but will have a different expense ratio and provide different levels of revenue sharing to MassMutual as a result of the application of different fee amounts at the SIA or sub-account level (referred to as a "wrap fee")." Menu of Available Investment Options as of November 15, 2018 published by MassMutual ("SIA List") at 1 (exhibit K).

88.    The 2018 Auditor Report identifies the SIA which was in the Plan in 2018 by a SIA reference number. Matching the reference number from the 2018 5500 to the SIA list shows that the expense ratios found on the SIA list matches the expense ratios listed on the proposed class representatives account statements and fee disclosures. Accordingly, Mass Mutual engages in nothing more than a rebranding process for mutual funds freely available on the market except they don't bear the MassMutual name.

89.    In addition, the summary prospectuses for many of the unbranded versions of each MassMutual fund confirms that each of the five funds listed below engage in this rebranding process. Several of the prospectuses describe how MassMutual adds fees to each underlying investment with no added benefit as follows:    "depending on the level of administrative service revenue ("ASR") generated from the underlying investment and MassMutual's target ASR for the plan, on a periodic basis MassMutual will make adjustments to the unitized plan fund's expense to cause each united plan fund to produce ASR equal to the target ASR."

90.    There is no difference between the underlying mutual fund and the rebranded Mass Mutual product. The funds hold identical investments, have the same managers, risk return

profiles and investment strategy.[9]  Because the underlying funds are otherwise *identical* to the Mass Mutual version, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

91.     Generally, products rebranded by insurance companies such as Mass Mutual are targeted at smaller investors with less bargaining power, while the underlying investments which don't bear the Mass Mutual name are targeted at institutional investors with more assets. While the underlying investments may have an investment minimum, qualifying for them usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).

92.     During 2018, for example, there were five funds in the Plan which needlessly bore the Mass Mutual name at great expense and detriment to Plan participants. In 2018, these five funds harbored over 81million dollars which easily qualified the Plan to invest in identical products not rebranded by Mass Mutual.  The following chart provides detail on these funds:

| Current Fund | ER | Identical Lower Cost Fund | ER | Excess Expense |
|---|---|---|---|---|
| MM Total Return Bond | 0.51 % | PGIM Total Return Bond R6 | 0.39% | 74% |
| MM International Growth | 1.32 % | Invesco International Growth R6 | 0.90% | 47% |
| MM Developing Mkts | 1.07% | Invesco/Oppenheimer Developing Markets R6 | 0.83% | 27% |

---

[9] See the summary prospectus for each MassMutual fund as compared to the summary prospectus for the unbranded version of the same fund. Looking at the MassMutual Invesco Developing Markets, as an example, the investment manager for the fund is Justin M. Leverenz, CFA. The investment objective and strategy are identical. Thus the MM version of the fund is identical to the unbranded version except the MassMutual version is much more expensive.

| Current Fund | ER | Identical Lower Cost Fund | ER | Excess Expense |
|---|---|---|---|---|
| MassMutual Premier Infl-Prot and Inc | 1.36% | MassMutual Premier Infl-Prot & Inc. I | 0.48% | 21% |
| MM Templeton Global Bond | 0.71% | Templeton Global Bond R6 | 0.56% | 27% |

93.     Let's look at the MM Developing Markets fund as an example. The 2018 5500 lists this fund as having an SIA number of SIA-C. Looking at SIA-C on the SIA List shows that it has an expense ratio of 1.07% which matches the expense ratio listed on participant statements and fee disclosures. Therefore, the underlying unbranded version of MM Developing Markets must be Invesco/Oppenheimer Developing Markets R6 with an expense ratio of .83%. The 5500 refers to the SIA-C as the Oppenheimer Developing Markets fund. 2018 Auditor Report at 13. The other four funds were analyzed in a similar manner with similar results.

94.     The above is for illustrative purposes only. At all times during the Class Period, Defendants knew or should have known of the existence of the identical underlying unbranded products and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

95.     There is no good-faith explanation for utilizing branded funds when lower-cost unbranded products are available for the exact same investment.  Because the branded products chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive branded funds ***could not have*** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive branded funds; the only consequence was higher costs for Plan participants.

96.     Defendants made investments with higher costs (higher expense ratios) available to participants while the same unbranded investments with lower costs (lower expense ratios)

were available to the detriment of the compounding returns that participants should have received. This reduces the likelihood that participants achieve their preferred lifestyle in retirement.

97.    Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in unbranded products. For this reason, prudent retirement plan fiduciaries will search for and select unbranded products at the lowest-priced share class available.

98.    Indeed, recently a court observed that where funds are "otherwise *identical* … but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary … provide identical investments at lower costs … ." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

99.    Here, had the Plan's fiduciaries prudently undertook their fiduciary responsibility for "oversight of the Plan, determin[ing] the appropriateness of the Plan's investment strategy, and monitor[ing] investment performance" the Plan would have moved to the unbranded versions of the identical fund. 2018 Auditor Report at 7.

**D.    Failure to Investigate Availability of Lower Cost Collective Trusts**

100.    Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts (also referred to as CITs), which pool plan participants' investments further and provide lower fee alternatives to even institutional share classes of mutual funds which have traditionally had the lowest expense ratios.

101.    Indeed, fiduciary best practices requires that fiduciaries inquire as to the availability of lower-cost investment alternatives like collective trusts.  "Best Practices for Plan Fiduciaries," at 36.  The use of collective trusts is also endorsed under trust law from which ERISA is derived.  *Tibble*, 135 S. Ct. at 1828.  Trust law states to determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts § 100 cmt. b(1) (emphasis added).

102.    Here, similar to the mutual funds discussed above, Defendants failed to timely consider available lower cost identical collective trusts to the collective trusts offered by Mass Mutual which are branded as American Century target date funds. These funds were available on the market since 2014. The Plan did not move to collective trusts until 2017 but when it did, the collective trusts had excessive expense ratios because Mass Mutual rebrands available funds from other providers as its own product with the only difference being that the Mass Mutual product is much more expensive. The failure to move to collective trusts beginning in at least 2014 is inexplicable given that the Committee knew or should have known of the benefits of collective trusts because the Plan Document itself permits investment in collective trusts. As described in the Plan Document, "[p]lan assets may also be invested in a common/collective trust fund … ." Plan Doc. at 110.

103.    Accordingly, the Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of identical lower cost American Century collective trusts, similar to the MassMutual branded mutual funds above, had the identical asset allocation and managers as the Mass Mutual American Century branded target date mutual funds in the Plan. Because of the Plan's significant concentration in American Century target date funds, it could

have reaped considerable cost savings by using lower cost collective trusts earlier, but Defendants failed to investigate, or blatantly ignored, this option.

104. The Mass Mutual target date products are identical in all respects to the American Century product except for price. This "rebranding" has cost participants millions in lost savings and opportunity. The Mass Mutual version had an expense ratio of .70% while the identical American Century version had an expense ratio of only .23%[10].

105. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the following funds that should have been converted to lower cost identical collective trusts at the earliest opportunity:

| Current Fund | ER | Identical Lower Cost CIT | ER | Excess Expense |
|---|---|---|---|---|
| MM American Century In Retirement 2045 CIT | 0.70% | American Century In Retirement 2045 CIT | 0.23% | 204% |
| MM American Century In Retirement 2050 CIT | 0.70% | American Century In Retirement 2050 CIT | 0.23% | 204% |
| MM American Century In Retirement 2040 CIT | 0.70% | American Century In Retirement 2040 CIT | 0.23% | 204% |
| MM American Century In Retirement 2035 CIT | 0.70% | American Century In Retirement 2035 CIT | 0.23% | 204% |
| MM American Century In Retirement 2030 CIT | 0.70% | American Century In Retirement 2030 CIT | 0.23% | 204% |
| MM American Century In Retirement 2045 CIT | 0.70% | American Century In Retirement 2045 CIT | 0.23% | 204% |
| MM American Century In Retirement 2020 CIT | 0.70% | American Century In Retirement 2020 CIT | 0.23% | 204% |
| MM American Century In Retirement 2055 CIT | 0.70% | American Century In Retirement 2055 CIT | 0.23% | 204% |
| MM American Century In Retirement 2060 CIT | 0.70% | American Century In Retirement 2060 CIT | 0.23% | 204% |

---

[10] Summary Prospectuses are not publicly available for the MassMutual branded target date funds. However, in September of 2018, the Plan did in fact move to the identical American Century version of its target date funds with an expense ratio of only .23% as opposed to the excessive expense ratio of .70% offered by the MassMutual version. This change was too little too late as the damages to participants savings were already baked in.

106.    The above is for illustrative purposes only.  During the Class Period, Defendants knew or should have known of the existence of these available collective trusts and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

107.    Minimum initial investment amounts are typically waived for institutional investors like retirement plans.  *See, e.g., Davis, et al. v. Washington Univ., et al.*, 960 F.3d 478, at 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda,* 923 F.3d at 329 (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).  Here, the minimum eligibility requirement for American Century CIT target dates is $15 million in client assets.[11]

108.    Target date funds are sold as a package with the minimum investment amount referring to the total amount invested across all target date funds. In early 2018, for example, the Plan had nine Mass Mutual Target Date CIT funds ranging from an expected retirement date of 2020 to 2060 at five-year intervals.  A minimum needed to qualify refers to the total of all assets held in all of the 9 funds collectively.  Looking at 2018, the Plan had over $560 million dollars invested in Mass Mutual branded American Century target date funds.

109.    Clearly, per the below chart, the Plan had sufficient assets under management during the Class Period to qualify for the lower cost American Century collective trusts with the only difference being they lacked the Mass Mutual branding:

| Fund in the Plan | 2018 AUM | 2017AUM | 2016 AUM | 2015 AUM | 2014 AUM |
|---|---|---|---|---|---|

---

[11] Information available at https://ipro.americancentury.com/content/ipro/en/products/client-objective/target-date-solutions/iuo/american-century-retirement-date-trust.html. Must have login permission from American Century. Last accessed on November 20, 2020.

| Fund in the Plan | 2018 AUM | 2017AUM | 2016 AUM | 2015 AUM | 2014 AUM |
|---|---|---|---|---|---|
| MM American Century In Retirement Target Dates 2020 through 2060[12] | $560,287,249 | $517,375,928 | $313,339,748 | $191,227,329 | $141,217,978 |

There is no good-faith explanation for utilizing higher-cost funds when lower-cost funds are available for the exact same investment.  Indeed, given that the collective trusts were comprised of the same underlying investments as their mutual fund counterparts, and managed by the same investment manager, but had lower fees, they generally had greater returns when looking at the 1, 3 and 5 year average annual returns.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive funds; the only consequence was higher costs for Plan participants.  Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

**E.  Defendants Failed to Adequately Monitor the Plan's Recordkeeping Expenses**

110.    Another clear indication of Defendants' imprudent fee monitoring process was the excessive recordkeeping and administrative fees the Plan's participants were required to pay during the Class Period.

111.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping expenses can either be paid directly from plan assets, or indirectly from the

---

[12] Throughout 2017 and up to the third quarter of 2018, the Plan was invested in the Mass Mutual branded version of the American Century In Retirement CIT target date funds. From 2014 through 2016 the Plan was invested in the Mass Mutual version of the American Century One Choice target date funds. As demonstrated above, the Plan had sufficient assets under management in 2014 to 2016 to have switched to the American Century In Retirement CIT target date funds as soon as they were available in mid-2014. Since the Plan had over 500 million dollars invested across all target date funds in 2017 and 2018, it could have qualified for the class IX share CIT with an expense ratio of only .23% which the Plan did in fact switch to in late 2018. In 2014 through 2016 the Plan could have easily qualified for the class I share CIT with an expense ratio of .38%, well below the .87% expense ratio charged by American Century One Choice target date funds on average during 2018.

higher expense ratios charged by the Mass Mutual branded funds (or a combination of both or by a plan sponsor).

112.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plans). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

**A.** Recordkeeping;

**B.** Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

**C.** Administrative services related to converting a plan from one recordkeeper to another;

**D.** Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

**E.** Maintenance of an employer stock fund (if needed);

**F.** Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

**G.** Plan consulting services, including assistance in selecting the investment lineup offered to participants;

**H.** Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[13] (excluding the separate fee charged by an independent third-party auditor);

**I.** Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

**J.** Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

113.    This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

114.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants.  These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

**A.** Loan processing;

**B.** Brokerage services/account maintenance (if offered by the plan);

**C.** Distribution services; and

---

[13]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

**D.** Processing of qualified domestic relations orders.

115.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plans.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

116.    The cost of providing recordkeeping services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

117.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

118.    In this matter, using excessive expense ratios to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

119.    Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if recordkeeping and administrative expenses appear high in relation to the general marketplace,

and specifically, of like-situated plans. More specifically, an RFP should happen every three to five years. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

120.    Because the Plan paid yearly amounts in recordkeeping fees that were well above industry standards each year over the Class Period, there is little to suggest that Defendants conducted an appropriate RFP at reasonable intervals – or certainly at any time prior to 2014 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

121.    As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were astronomical when benchmarked against similar plans.

| Year | #Participants | Hard Dollar Payment to Mass Mutual | Indirect Payments to Mass Mutual | Total Comp to Mass Mutual | Per Participant Cost |
|---|---|---|---|---|---|
| 2022 | 92372 | $1,765,228.00[14] | | | $19.11 |
| 2021 | 45254 | $1,656,390.00[15] | | | $36.60 |
| 2020 | 42794 | $1,462,690.00 | $137,660 | $1,600,350.00 | $37.40 |
| 2019 | 41884 | $1,866,272.00 | $687,725 | $2,553,997.00 | $60.98 |
| 2018 | 39958 | $809,873.00 | $1,984,378.00 | $2,794,251.00 | $69.93 |
| 2017 | 35844 | $377,685.00 | $1,153,649.00 | $1,531,334.00 | $42.72 |
| 2016 | 29972 | $322,396.00 | $1,568,281.00 | $1,890,677.00 | $63.08 |
| 2015 | 25191 | $279,497.00 | $1,233,379.00 | $1,512,876.00 | $60.06 |
| 2014 | 18979 | $192,836.00 | $759,099.00 | $951,935.00 | $50.15 |

122.    By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

123.    Looking at recordkeeping costs for other plans of a similar size in 2019 shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and

---

[14] In 2022 the Plan's recordkeeper was Empower.
[15] In 2021 the Plan's recordkeeper was Great West.

administration fees. The Plan had between 19,000 and 45,000 participants between 2014 and 2021. The chart below analyzes several plans having this range of participants during this range of time:

| Comparable Plans' R&A Fees Paid in 2019[16] | | | | | |
|---|---|---|---|---|---|
| Plan Name | Number of Participants | Assets Under Management | Total R&A Costs[17] | R&A Costs on Per-Participant Basis | Record-keeper |
| Deseret 401(k) Plan | 34,938 | $4,264,113,298 | $773,763 | **$22** | Great-West |
| The Dow Chemical Company Employees' Savings Plan | 37,868 | $10,913,979,302 | $932,742 | **$25** | Fidelity |
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | **$27** | Vanguard |
| Danaher Corporation & Subsidiaries Savings Plan | 33,116 | $5,228,805,794 | $1,124,994 | **$34** | Fidelity |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | **$30** | Alight Financial |

Based on these comparators, the Plan should have been able to negotiate a recordkeeping cost far below what it was paying. It was not until 2022 when the Plan started paying $19.11 per participant for recordkeeping that it came within a reasonable range for recordkeeping. The Plan participants, however, should not have paid the price for the years of neglect.

124.    As another example indicating reasonable recordkeeping rates, in a recent lawsuit where Fidelity's multi-billion dollar plan with over 58,000 participants was sued, the "parties []stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value

---

[16] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019, which is the most recent year for which many plans' Form 5500s are currently available.

[17] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2019) at pg. 27 (defining each service code), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf.

of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."

*Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

125.    Specifically, Fidelity stipulated as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that *Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year*. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

126.    The Plan's demographics matches favorably with the Fidelity plan's demographics demonstrating the Plan fiduciaries could have negotiated for recordkeeping and administration fees as low as $14 and up to $21 per participant in recordkeeping and administration fees.

127.    The Plan's total recordkeeping costs are clearly unreasonable as demonstrated above.  Many authorities have also recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[18]

---

[18] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

128.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments forwards profits from charging excessive expense ratios to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any excessive payments beyond a reasonable level be returned to the plan and its participants.

129.    Here, based on the Plan's Form 5500 filings throughout the Class Period MassMutual was receiving compensation as a contract administrator using codes: 52 (investment management fees), 60 (sub-transfer agency fees), 62 (float revenue), 64 (Recordkeeping fees), 68 (soft dollar commissions) and 72 (other investment fees and expenses). These additional fees were clearly not justified given that MassMutual's primary service was as a recordkeeper.

130.    Indeed, when Empower took over as recordkeeper in 2022, the only service codes indicated in the Form 5500s were 38 (Participant Communication), 62 (Float revenue) and 65 (Account maintenance fees).  Without utilizing any of the other service codes Mass Mutual utilized as a recordkeeper, Empower managed to charge a fraction of what Mass Mutual charged while providing the same routine recordkeeping services for the Plan.

131.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

132.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

133.    At all relevant times, the Committee Defendants and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

134.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

135.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost and/or poor performance of the funds in relation to other comparable investments. The Prudence Defendants also failed to control the administrative and recordkeeping expenses of the Plan and to investigate the availability of lower-cost identical products of certain mutual funds and lower cost identical collective investment trust funds in the Plan.

136.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

137.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

138.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Board and Cognizant)**

139.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

140.    The Board Defendants and Cognizant (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

141.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations,

and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

142.    The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

143.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

    (a)    Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

    (b)    failing to monitor the processes by which the Plan's investments were evaluated and the Committee's failure to investigate the availability of identical lower-cost funds; and

    (c)    failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

144.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

145.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated:  June 21, 2024           **CAPOZZI ADLER, P.C.**

/s/ Mark K. Gyandoh       .
Mark K. Gyandoh, Esquire
N.J. Bar ID: 025622001
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2024, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


By: */s/ Mark K. Gyandoh*