**MAYER BROWN LLP**
Bryan Nese
  *bnese@mayerbrown.com*
Alex Lakatos
  *alakatos@mayerbrown.com*
1999 K Street NW
Washington, DC 20006
Telephone: (202) 263-3000

Nancy Ross
*nross@mayerbrown.com*
71 South Wacker Drive
Chicago, IL 60606-4637
Telephone: (312) 782-0600

*Counsel for Defendants.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARK MILANO, *et al*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION., *et al*,<br><br>        *Defendants*. | Civil Action No. 2:20-cv-17793-MEF-SDA |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

FACTUAL BACKGROUND .................................................................................5

I.     THE PLAN ..................................................................................................6

     A.     The Plan's Target Date Funds .......................................................6

     B.     The Plan's Recordkeeping Fees ....................................................8

II.     PLAINTIFFS' CLAIMS .............................................................................9

ARGUMENT .........................................................................................................9

I.     LEGAL STANDARD .................................................................................9

II.     PLAINTIFFS' CHALLENGES TO THE PLAN'S AMERICAN
     CENTURY TDFS FAIL TO PLAUSIBLY ALLEGE MISCONDUCT .....11

     A.     Plaintiffs do not plausibly allege that Defendants breached their
               fiduciary duties by selecting the American Century TDFs
               instead of a different brand of TDFs ..................................................11

     B.     Plaintiffs do not plausibly allege that Defendants breached their
               fiduciary duties by utilizing mutual fund versions of the
               American Fund TDFs instead of CIT alternatives ............................20

III.     PLAINTIFFS' CHALLENGE TO MASSMUTUAL FUNDS FAILS
     BECAUSE PLAINTIFFS LACK STANDING AND ALLEGE THAT
     THE MASSMUTUAL FUNDS SAVED THE PLAN MONEY ................24

     A.     Plaintiffs lack standing to contest the MassMutual Funds ................24

     B.     Plaintiffs fail to plausibly allege that Defendants' process for
               selecting the five challenged funds was imprudent ...........................25

IV.     PLAINTIFFS' CHALLENGE TO THE PLAN'S RECORDKEEPING
     FEES FAILS TO STATE A CLAIM .........................................................28

V.     PLAINTIFFS' CLAIM AGAINST COGNIZANT AND THE
     BOARD FOR FAILURE TO MONITOR SHOULD BE DISMISSED ......38

CONCLUSION ....................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allergan ERISA Litigation*, 975 F.3d 348 (3d Cir. 2020) ...........................................1

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
    579 F. Supp. 3d 1133 (N.D. Cal. 2022).............................................................12

*Antoine v. Marsh & McLennan Cos., Inc.*,
    No. 22 CIV. 6637, 2023 WL 6386005 (S.D.N.Y. Sept. 30, 2023) ...............1, 16

*Aragon v. Twp. of Woodbridge*,
    No. 21-cv-18304, 2023 WL 2570146 (D.N.J. Mar. 20, 2023)...........................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................9

*Bekker v. Neuberger Berman Group LLC*,
    No. 16-cv-6123, 2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018).......................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................9

*Boyette v. Montefiore Med. Ctr.*,
    No. 22-CV-5280, 2023 WL 7612391 (S.D.N.Y. Nov. 13, 2023) ......................28

*Braden v. Wal-Mart Stores Inc.*,
    588 F.3d 585 (2009)..........................................................................................22

*Brock v. Robbins*,
    830 F.2d 640 (7th Cir. 1987) ...........................................................................28

*Buck v. Hampton Twp. Sch. Dist.*,
    452 F.3d 256 (3d Cir. 2006) ...............................................................................5

*Cho v. Prudential Ins. Co. of Am.*,
    No. 19-19886, 2021 WL 4438186 (D.N.J. Sept. 27, 2021)........................*passim*

*Cope v. Hudson's Bay Co. Severance Pay Plan for US Emps.*
    *Amended*,
    No. CV 20-6490, 2023 WL 174960 (E.D. Pa. Jan. 12, 2023)............................5

*Cottillion v. United Refin. Co.*,
  279 F.R.D. 290 (W.D. Pa. 2011) ........................................................................40

*Davis v. Salesforce.com, Inc.*,
  No. 20-CV-01753, 2020 WL 5893405 (N.D. Cal. Oct. 5, 2020) ......................21

*DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*,
  920 F.2d 457 (7th Cir. 1990) .............................................................................13

*Dorman v. Charles Schwab Corp.*,
  No. 17-CV-00285, 2018 WL 6803738 (N.D. Cal. Sept. 20, 2018)...................17

*Evans v. Associated Banc-Corp*,
  No. 21-C-60, 2022 WL 4638092 (E.D. Wis. Sept. 30, 2022) .............................6

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
  No. 17-CV-6685, 2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) ........................5

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014)...................................................................................*passim*

*Finkelman v. Nat'l Football League*,
  810 F.3d 187 (3d Cir. 2016) ..............................................................................25

*Fritton v. Taylor Corp.*,
  No. 22-CV-00415, 2022 WL 17584416 (D. Minn. Dec. 12, 2022) ............33, 35

*Genesis Bio-Pharmaceuticals, Inc. v. Chiron Corp.*,
  27 F. App'x. 94 (3d Cir. 2002) ..........................................................................10

*Gonzalez v. Northwell Health, Inc.*,
  632 F. Supp. 3d 148 (E.D.N.Y. 2022) ...............................................................30

*Harmon v. FMC Corp.*,
  No. 16-cv-6073, 2018 WL 1366621 (E.D. Pa. Mar. 16, 2018)....................11, 13

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) .............................................................................20

*Hughes v. Nw. Univ.*,
  595 U.S. 170 (2022)..............................................................................10, 16, 35

*Hughes v. Nw. Univ.*,
63 F.4th 615 (7th Cir. 2023) ...............................................................10

*IJKG Opco LLC v. Gen. Trading Co.*,
No. 17-6131, 2020 WL 1074905 (D.N.J. Mar. 6, 2020) ....................40

*Johnson v. Parker-Hannifin, Corp.*,
No. 21-cv-256, 2023 WL 8374525 (N.D. Ohio Dec. 4, 2023)...........24

*Johnson v. PNC Fin. Servs. Grp., Inc.*,
No. 20-CV-01493, 2021 WL 3417843 (W.D. Pa. Aug. 3, 2021)........33, 38

*Jones v. Baskin, Flaherty, Elliot & Mannino, P.C.*,
738 F. Supp. 937 (W.D. Pa. 1989), *aff'd* 897 F.2d 522 (3d Cir.
1990) ......................................................................................................13

*Jones v. Dish Network Corp.*,
No. 22-cv-167, 2023 WL 2796943 (D. Colo. Jan. 31, 2023).............35

*K.J. v. Greater Egg Harbor Regional High School Bd. of Educ.*,
No. 14-0145, 2015 WL 5039460 (D.N.J. Aug. 26, 2015)..................19

*Kistler v. Stanley Black & Decker, Inc.*,
No. 22-CV-966, 2024 WL 3292543 (D. Conn. July 3, 2024)............19

*Krutchen v. Ricoh USA, Inc.*,
No. CV 22-678, 2022 WL 16950264 (E.D. Pa. Nov. 15, 2022) ........29

*Leimkuehler v. Am. United Life Ins.*,
713 F.3d 905 (7th Cir. 2013) .................................................................8

*Mateya v. Cook Grp. Inc.*,
No. 22-cv-1271, 2023 WL 4608536 (S.D. Ind. June 16, 2023) ..................30, 33

*Matney v. Barrick Gold of N. Am., Inc.*,
No. 20-CV-275, 2022 WL 1186532 (D. Utah Apr. 21, 2022), *aff'd
sub nom. Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136 (10th
Cir. 2023) ................................................................21, 27, 29, 38

*Mattson v. Milliman, Inc.*,
No. C22-37, 2022 WL 2357052 (W.D. Wash. June 30, 2022) ..........13

*McCaffree Fin. Corp. v. ADP, Inc.*,
   No. 20-cv-5492, 2023 WL 2728787 (D.N.J. Mar. 31, 2023) .............................24

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) ...............................................................................20

*Milbrand v. Miner*,
   No. 17-cv-761, 2018 WL 4051747 (M.D. Pa. Aug. 24, 2018)...........................22

*Neil v. Zell*,
   677 F. Supp. 2d 1010 (N.D. Ill. 2009) ...............................................................39

*Nokia ERISA Litig.*, No. 10-cv-3306, 2011 WL 7310321 (S.D.N.Y.
   Sept. 6, 2011) ......................................................................................................39

*Nunez v. B. Braun Med., Inc.*,
   No. CV 20-4195, 2023 WL 5339620 (E.D. Pa. Aug. 18, 2023) ...................5, 37

*Patterson v. Morgan Stanley*,
   No. 16-cv-6568, 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ....................17, 18

*Perelman v. Perelman*,
   793 F.3d 368 (3d Cir. 2015) ...............................................................................24

*Pizarro v. Home Depot, Inc.*,
   634 F. Supp. 3d 1260 (N.D. Ga. 2022), *aff'd*, 2024 WL 3633379
   (11th Cir. Aug. 2, 2024).......................................................................................17

*Pizarro v. Home Depot, Inc.*,
   No. 22-13643, 2024 WL 3633379 (11th Cir. Aug. 2, 2024).........................16, 33

*Renfro v. Unisys Corp.*,
   671 F.3d 314 (3d Cir. 2011) .................................................................2, 4, 7, 21

*Riley v. Olin Corp.*,
   No. 21-cv-01328, 2023 WL 371872 (E.D. Mo. Jan. 24, 2023).........................12

*Robern, Inc. v. Glasscrafters, Inc.*,
   206 F. Supp.3d 1005 (D.N.J. 2016).....................................................................40

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
   No. 15-CV-1839, 2016 WL 7494320 (D. Conn. Dec. 30, 2016) .......................26

*Sacerdote v. N.Y. Univ.*,
    328 F. Supp. 3d 273 (S.D.N.Y. 2018)) ................................................................37

*Scalia v. WPN Corp.*,
    417 F. Supp. 3d 658 (W.D. Pa. 2019)................................................................38

*Sigetich v. Kroger Co.*,
    No. 21-CV-697, 2023 WL 2431667 (S.D. Ohio Mar. 9, 2023) ........................33

*Singh v. Deloitte LLP*,
    650 F. Supp. 3d 259 (S.D.N.Y. 2023) ...........................................................3, 30

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs.*
    *Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) .......................................................................10, 11

*Thole v. U.S. Bank, N.A.*,
    590 U.S. 538 (2020).........................................................................................24

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir.), *cert. denied*, 574 U.S. 991 (2014) ..............................26

 *Wehner v. Genentech, Inc.*,
    No. 20-CV-06894, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021)........................33

*White v. Chevron Corp.*,
    No. 16-CV-0793, 2017 WL 2352137 (N.D. Cal. May 31, 2017) .....................28

*White v. Chevron Corp.*,
    No. 16-cv-793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016)..................*passim*

*Wildman v. Am. Century Servs., LLC*,
    362 F. Supp. 3d 685 (W.D. Mo. 2019)............................................................23

## INTRODUCTION

Zooming out to examine the Complaint holistically—as the Third Circuit mandates in the context of a motion to dismiss an ERISA complaint, *see In re Allergan ERISA Litigation*, 975 F.3d 348, 354 (3d Cir. 2020)—makes it readily apparent that Plaintiffs' amended claims are vapid. The First Amended Complaint ("FAC") offers nothing to show Defendants were imprudent and often includes allegations affirmatively showing that Defendants' choices were reasonable.

***First***, Plaintiffs attack the primary investment option that the Cognizant Plan offered to its plan participants: Target Date Funds ("TDFs") from American Century. Plaintiffs begin by saying that Defendants should have chosen a different brand of TDF, asserting that TDFs offered by companies other than American Century (*e.g.*, MSF Lifetime, T. Rowe Price) would have been superior. Yet the FAC's own exhibits (*i.e.*, annual performance charts for each year from 2014 to 2023) show that the American Century TDFs routinely outperformed the competition, or the benchmark that Plaintiffs say is relevant, or both. Not only does this fail to support an inference of imprudence, but it points in the opposite direction. Moreover, the Plan's TDFs did especially well in down markets, which demonstrates that the Defendants chose a conservative investment well positioned to shelter plan participants' retirement savings against losses—yet another indicia of prudence. *Antoine v. Marsh & McLennan Cos., Inc.*, No. 22 CIV. 6637, 2023 WL 6386005, at

1

*11 (S.D.N.Y. Sept. 30, 2023) (explaining that it is "reasonable and prudent to select conservative funds").

Plaintiffs next fault Defendants for offering the American Century TDFs in the form of a mutual fund rather than offering the American Century TDFs in the form of a Collective Investment Trust ("CIT")—at least until 2017, when Defendants switched to CITs.  But, as the Third Circuit has recognized, mutual funds offer consumer-friendly benefits, including "reporting, governance, and transparency requirements" that CITs do not.  *Renfro v. Unisys Corp.*, 671 F.3d 314, 318 (3d Cir. 2011).  Accordingly, as shown below, courts repeatedly have rejected the suggestion that choosing mutual funds over CITs bespeaks imprudence.

Plaintiffs' third complaint is that, although Defendants moved from American Century TDFs (in mutual fund form) to American Century TDFs (in CIT form) in 2017, Defendants did not obtain the lowest price on the CITs until 2018.  But Plaintiffs miss the forest for the trees.  The pattern they allege (*i.e.*, reviewing the Plan's lineup, modifying it, and each time lowering fees) shows precisely the attention to detail and ongoing enhanced savings that courts view as a *hallmark* of prudence.  *See White v. Chevron Corp.*, No. 16-cv-793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ("*White I*").  Courts recognize that savings from lower-priced investment products do not come with a mere snap of the fingers (as Plaintiffs would have it), and courts do not hold fiduciaries to that impossible standard.

2

***Second***, Plaintiffs mistakenly claim that five funds allegedly provided by MassMutual were overpriced.  To begin with, Plaintiffs lack constitutional standing because they suffered no injury-in-fact:  Plaintiffs did not invest in the MassMutual funds and the American Century TDFs in which Plaintiffs did invest performed well.  Even if Plaintiffs had standing, they still fail to state a claim, because the FAC shows that the five challenged funds actually cost *less* than what the Plan would have paid to get equivalent investments from someone other than MassMutual.  Plaintiffs simply fail to account for the monetary benefits that (1) the challenged funds afford the Plan, (2) the FAC acknowledges and Exhibit K to the FAC even quantifies, and (3) Plaintiffs' supposedly "lower cost" alternatives wholly lack.

***Third***, Plaintiffs assert that the Plan overpaid for recordkeeping services, but they cannot muster a single valid comparison to another plan that paid less.  Plaintiffs alleged recordkeeping fees for the Cognizant Plan include millions of dollars of "indirect" fees.  (Plaintiffs say nothing about where or how they came up with these large "indirect" numbers.)   As to four of Plaintiffs' five "comparator" plans, Plaintiffs *exclude* "indirect" fees.  That is a fatal blunder; it renders their comparators meaningless.  *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 265 (S.D.N.Y. 2023) (appeal pending).  And their fifth comparator is even worse; that plan had two recordkeepers, yet Plaintiffs include only one when calculating its recordkeeping fees.  Correcting that mistake shows that the comparator's recordkeeping fees were

on par with what the Cognizant Plan paid. The fact that *all* of Plaintiffs' own comparators are woefully inapt, and even support the Plan's fees, is telling. Looking at the bigger picture, the FAC shows no imprudence.

***Finally***, Plaintiffs' failure to monitor claim fails. There is no underlying violation, so, by definition, there is no failure to monitor. Additionally, Plaintiffs do not allege conduct by Cognizant and the Board sufficient to show that those Defendants failed to monitor the Committee. Nor do Plaintiffs establish that the Board and the Company had fiduciary authority over the Committee, yet another ground for dismissal.

At bottom, the FAC goes awry because it ignores the Supreme Court and Third Circuit's fundamental ERISA teachings. To begin, ERISA considers process, not results, and, to state a claim, Plaintiffs must make allegations sufficient to allow the court to "infer from what is alleged that the [Defendant's] process was flawed." *Renfro*, 671 F.3d at 327 (quoting *Braden v. Wal-Mart Stores Inc.*, 588 F.3d 585, 596 (2009)). Yet, here, not only do Plaintiffs say nothing about Defendants' process, but their allegations do not permit the court to draw an inference of misconduct. And while ERISA's test for prudence turns on the "circumstances then prevailing," 29 U.S.C. § 1104(a)(1)(B), Plaintiffs eschew context in favor of generic allegations and theories that, if embraced, would indiscriminately deem every fiduciary for every plan imprudent. For example, Plaintiffs hold out the T. Rowe Price TDFs as a

4

prudent alternative to the American Century Funds that the Plan provided, yet Plaintiffs' attorneys have repeatedly sued companies that chose the T. Rowe Price TDFs they now espouse.[1]  Given that the FAC is wholly divorced from ERISA's fundamental precepts, it is hardly surprising that Plaintiffs fail to state a claim.

## FACTUAL BACKGROUND

The facts below are from the FAC and materials that this Court properly may consider on a motion to dismiss, i.e., "documents that are attached to or submitted with the complaint . . . and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'"  *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).  In ERISA cases, courts may (and routinely do) take judicial notice of plan documents, statutorily required disclosures, and IRS Forms 5500.  *See, e.g., Cope v. Hudson's Bay Co. Severance Pay Plan for US Emps. Amended*, No. CV 20-6490, 2023 WL 174960, at *4 (E.D. Pa. Jan. 12, 2023) ("In ERISA actions, courts routinely consider plan documents."); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-CV-6685, 2019 WL 4466714, at *1 n.1 (S.D.N.Y. Sept. 18, 2019) (taking judicial notice of "required fee disclosures

---

[1] *See* Order at 2, *Parmer v. Land of Lakes*, No. 20-cv-1253 (D. Minn. 2021), ECF No. 63; *Nunez v. B. Braun Med., Inc.*, No. CV 20-4195, 2023 WL 5339620, at *9 (E.D. Pa. Aug. 18, 2023).

provided to participants of the Plan"); *Evans v. Associated Banc-Corp*, No. 21-C-60, 2022 WL 4638092, at *3 (E.D. Wis. Sept. 30, 2022) ("a Form 5500 is 'publicly available on the Department of Labor's website,' and district courts 'can take judicial notice of information on government websites.'" (quoting *Bartnett v. Abbott Lab'ys,* 492 F. Supp. 3d 787, 798 n.2 (N.D. Ill. 2020))).

# I.    THE PLAN

The Plan is a "defined contribution" retirement plan sponsored by Cognizant and offered to its employees as a benefit for tax-deferred retirement savings. *See* FAC ¶¶ 50-51. Plaintiffs allege that as of December 2018, the Plan had 39,958 participants with balances totaling approximately $1.1 billion dollars. *Id.* ¶¶ 10, 44.

## A.    The Plan's Target Date Funds

Among other options, the Plan provides a suite of ten TDFs. A TDF provides a single diversified investment vehicle for plan participants. FAC ¶ 22. These funds pursue "a long-term investment strategy, using a mix of asset classes (or asset allocation) that the fund provider adjusts to become more conservative over time."[2] The "target date" refers to the participant's expected retirement year, e.g., "target date 2030" investments are designed for individuals who intend to retire in 2030. *Id.* Each such year is known as a "vintage," and together the different vintages make up

---

[2] *See* Frequently Asked Questions about Target Date or Lifecyle Funds, Institutional Investor, (Aug. 24, 2016), https://tinyurl.com/3m458m67.

a "suite" of TDFs.

The Plan changed its TDFs twice during the putative Class Period, each time becoming less expensive. In 2014, at the start of the class period, the Plan used the American Century One Choice TDFs, with an alleged expense ratio of .87%. FAC ¶ at 109 n.12.[3] These TDFs are sold as mutual funds. FAC ¶ 102. "A mutual fund is a pool of assets, consisting primarily of a portfolio of securities, and belonging to the individual investors holding shares in the fund. Mutual funds are organized as investment companies, which are governed by the Securities Act of 1933 and the Investment Company Act of 1940." *Renfro*, 671 F.3d at 318 (cleaned up).

In 2017, the Plan switched to the American Century In Retirement TDFs, with an alleged expense ratio of .70%. FAC ¶¶ 102, 105. The American Century In Retirement TDFs are sold as collective investment trusts ("CITs"). FAC ¶¶ 100, 102, 105. Unlike mutual funds, CITs "are administered by banks or trust companies" and typically have lower costs given, among other things, their "simple disclosure requirements." Compl. ¶ 77 n.6. More specifically, CITs are not subject to the same "reporting, governance, and transparency requirements" as mutual funds. *Renfro*, 671 F.3d at 318. In 2018, the Plan switched again, offering the American Century

---

[3] An expense ratio is the fee associated with purchasing an investment in the form of a percentage based charge, e.g., a plan participants who invests $1,000 in an investment with a .10% expense ratio pays $1 ($1,000 x .0001).

In Retirement TDFs, which were CITs with an expense ratio of .23%.  FAC ¶ 105.

### B.     The Plan's Recordkeeping Fees

Prior to September 2018, the Plan paid recordkeeping fees through a revenue sharing arrangement with MassMutual.  FAC ¶ 117 and Ex. K.  Revenue sharing is "an arrangement allowing mutual funds to share a portion of the fees that they collect from investors with entities that provide services to the mutual funds," such as recordkeepers.  *Leimkuehler v. Am. United Life Ins.*, 713 F.3d 905, 907-08 (7th Cir. 2013).   For example, in this case, in 2018, the investment manager for the Oppenheimer Developing Markets fund paid .30% (revenue sharing) of its fees (1.07% of investments) to the Plan's recordkeeper for recordkeeping services.  *See* FAC, Ex. K at 5 (setting forth amounts of revenue sharing for the Developing Markets fund).

In the case of the Cognizant Plan, MassMutual credited back a portion of fees received to participant accounts to offset administrative expenses, such as recordkeeping expenses.  *See* ECF No. 17-8, at 13 (7.27.18 Disclosure) ("To the extent MassMutual receives revenue from a plan investment offered under your plan that is available to offset your plan's administrative services expenses, MassMutual will calculate the amount of the revenue received that is attributable to your interest in that investment and will allocate that amount to your account.").

In September 2018, the Plan switched to a flat, per-participant recordkeeping

fee of $42 per participant.  ECF. No. 17-8, at 13.  In March 2019, the fee was reduced to $26 per participant, and, in September 2019, reduced further to $23 per participant.  ECF No. 17-9, at 10 (1.28.19 Disclosure); ECF No. 17-10, at 10 (7.24.19 Disclosure).

## II.    PLAINTIFFS' CLAIMS

Plaintiffs allege that Defendants breached their fiduciary duty of prudence by (1) selecting the American Century TDFs instead of another brand of TDFs that Plaintiffs would have preferred, *see* FAC ¶¶ 80-85, and Ex. A-J thereto; (2) not using the CIT version of the American Century TDFs that Plaintiffs would have preferred, FAC ¶¶ 100-09; (3) utilizing five investments allegedly provided by MassMutual instead of obtaining those investments from alternative providers that Plaintiffs would have preferred, FAC ¶¶ 86-99, and (4) supposedly overpaying for recordkeeping services until 2022, FAC ¶¶ 110-21.

## ARGUMENT

## I.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint must allow the Court to infer "more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  Courts must accept well-pleaded allegations as true and draw reasonable inferences in the plaintiff's favor, but, if allegations are contradicted by documents upon which

plaintiff's claims are based, the court need not accept them as true. *Genesis Bio-Pharmaceuticals, Inc. v. Chiron Corp.*, 27 F. App'x. 94, 99–100 (3d Cir. 2002). Nor need a court accept conclusory allegations. *Aragon v. Twp. of Woodbridge*, No. 21-cv-18304, 2023 WL 2570146, at *3 (D.N.J. Mar. 20, 2023).

Further, as the Supreme Court instructed for ERISA fiduciary breach cases, the "appropriate inquiry" at the pleading stage "will necessarily be context specific," requiring "due regard" for "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). A plaintiff thus must "plausibly allege fiduciary decisions outside a range of reasonableness." *Id.* Strictly enforcing that requirement is essential, because motions to dismiss are an "important mechanism for weeding out meritless [ERISA] claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). This is especially true because fiduciaries often find themselves "between a rock and a hard place," facing litigation regardless of what decision they make. *Id.* at 424. Compounding that problem, "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous" and "elevates the possibility that a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) ("*St. Vincent*")

10

(citation omitted).

## II. PLAINTIFFS' CHALLENGES TO THE PLAN'S AMERICAN CENTURY TDFS FAIL TO PLAUSIBLY ALLEGE MISCONDUCT.

### A. Plaintiffs do not plausibly allege that Defendants breached their fiduciary duties by selecting the American Century TDFs instead of a different brand of TDFs.

Plaintiffs' theory that Defendants were imprudent in selecting the American Century TDFs (rather than another of the brands that Plaintiffs tout as supposedly superior choices) fails at every level. In short, Plaintiffs say nothing about Defendants' process for selecting the American Century TDFs and, in the face of that omission, offer no basis to infer that Defendants' process was imprudent.

To begin, Plaintiffs are silent as to Defendants' process. They offer no allegations whatsoever about *how* Defendants chose to invest in the American Century TDFs, nor *why* Defendants chose not to invest in the handful of cherry-picked alternatives that Plaintiffs assert would have been preferable. FAC ¶¶ 80-85. *See Harmon v. FMC Corp.*, No. 16-cv-6073, 2018 WL 1366621, at *5 (E.D. Pa. Mar. 16, 2018) (dismissing complaint because, *inter alia*, it "offer[ed] no direct allegations of flaws in Defendant's process"); *St. Vincent*, 712 F.3d at 718 (affirming dismissal of breach of fiduciary duty claim where, *inter alia*, "the Amended Complaint contains no factual allegations referring *directly* to Morgan Stanley's knowledge, methods, or investigations at the relevant times"). Plaintiffs instead ask this Court to infer that Defendants' process was imprudent based solely upon

circumstantial allegations (i.e., certain funds and a benchmark that Plaintiffs say were better than the American Century TDFs, FAC ¶ 85), but those allegations are wholly inadequate for four independent reasons.

*First*, "Plaintiffs who rely on 'circumstantial evidence must . . . provide a sound basis for comparison – a meaningful benchmark – to show a prudent fiduciary in like circumstances would have selected a different fund." *Cho v. Prudential Ins. Co. of Am.*, No. 19-19886, 2021 WL 4438186, at *7 (D.N.J. Sept. 27, 2021) (quoting *Sweda v. Univ. of Pa.*, 923 F.3d 320, 321 (3d Cir. 2019)).  Here, Plaintiffs flunk the meaningful benchmark test.  They only say that their comparator funds are "in the same Morningstar peer grouping" as the American Century TDFs.  FAC ¶ 84.  That is not enough.  As the court explained in *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133 (N.D. Cal. 2022), when rejecting plaintiffs' argument that a Morningstar "peer group category" is a meaningful benchmark, "the Morningstar 'peer group category' is an average of a large group of TDFs.  For example, Morningstar's peer group category for [defendant's] TDF with a target date of 2035 is an average of 224 funds with a target date of 2035.  Plaintiffs provide no information as to the aims, risks, or rewards of any individual fund within the 224 funds that constitute the peer group funds with a target date of 2035. . . .The TDFs in these categories could all have differing aims, risks, and rewards than the Intel TDFs." *Id.* at 1150–51 (record cites omitted). *See also Riley v. Olin Corp.*, No. 21-

12

cv-01328, 2023 WL 371872, at *5 (E.D. Mo. Jan. 24, 2023) (rejecting Morningstar categories for comparing fund performance); *Mattson v. Milliman, Inc.*, No. C22-37, 2022 WL 2357052, at *1 (W.D. Wash. June 30, 2022) (granting motion to dismiss; plaintiff had not "pleaded the necessary details about these alleged benchmarks" including 'aims, risks, and potential rewards' associated with individual funds grouped within the three Morningstar indices").

***Second***, even accepting Plaintiffs "comparators" as apt (which they are not), Plaintiffs still fail to establish imprudence, because Plaintiffs inappropriately rely on hindsight. "[T]he evaluation of a fiduciary's investment decisions cannot be made 'from the vantage point of hindsight.'" *Harmon*, 2018 WL 1366621, at *5 (quoting *St. Vincent*, 712 F.3d at 716). To assess imprudence, courts may consider only what was known to Defendants at the time of the challenged decision. "[R]etrospectively developing an investment strategy that would have yielded a higher rate of return does not prove that the fiduciary's strategy was unreasonable at the time he was acting." *Jones v. Baskin, Flaherty, Elliot & Mannino, P.C.*, 738 F. Supp. 937, 942 (W.D. Pa. 1989), *aff'd* 897 F.2d 522 (3d Cir. 1990). That is because ERISA, to put it simply, "requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990); *see also Fifth Third Bancorp.*, 573 U.S. at 425 ("the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts" (quoting 29 U.S.C. §

13

1104(a)(1)(B))).

Plaintiffs, however, provide performance information for only fiscal year 2014 (which would have been available in early 2015) and for later years. *See* FAC, at Exs. A-J. That information, even if it had reflected underperformance of the Plan's TDFs (which it did not), was not knowable to Defendants when they decided to offer the American Century TDFs in the Plan at the start of the class period in 2014. By definition, such information cannot support an inference of imprudence by fiduciaries who could not have known about it. *Cho*, 2021 WL 4438186, at *9 (dismissing ERISA claim for imprudent investment where "[p]laintiff fails to make plausible allegations as to the information available to Defendants at a particular point in time when retention decisions were made"). What is more, as discussed below, once the 2014 data became available, it showed stellar performance by the American Century TDFs that Plaintiffs challenge. FAC, Ex. K.

***Third***, even accepting Plaintiffs' inapt, hindsight comparison as valid (which it is not), Plaintiffs' "comparators" actually demonstrate the opposite of what Plaintiffs say, revealing the strength of the American Century TDFs.

- To begin, in 2014, the American Century TDFs outperformed the Morningstar Benchmark in ***all*** vintages. FAC, Ex. A. That same year, the American Century TDFs outperformed ***all*** of Plaintiffs' Comparator Funds

14

for the 2055, 2050, 2045, 2040, and 2035 vintages. *Id.* They also tied for best performing fund in the 2030 and 2020 vintages. *Id.*

- In 2015, the American Century TDFs outperformed the Morningstar Benchmark in all but one vintage, i.e., outperformed the benchmark in the 2050, 2045, 2040, 2035, 2030, 2025, and 2020 vintages. FAC, Ex. B.

- In 2018, the American Century TDFs outperformed the benchmark in all but one vintage, *i.e.*, American Century TDFs outperformed benchmark in the 2060, 2050, 2045, 2040, 2035, 2030, 2025, and 2020 vintages. The American Century TDFs also outperformed five of Plaintiffs' comparators in three vintages (2045, 2040, 2035) and four of Plaintiffs' comparators in two vintages (2050, 2030). Thus, the American Century TDFs beat most of Plaintiffs' comparators most of the time. FAC, Ex. E.

- In 2020, the American Century TDFs outperformed the Morningstar Benchmark in the 2060, 2050, 2045, 2040, and 2035 vintages. FAC, Ex. G. That same year, the American Century TDFs was the second best performing TDF in 2060 and 2055 vintages, and the third best performing TDF in another two vintages (2050, 2045).

- In 2022, the American Century TDFs beat the benchmark in all but one vintage; i.e., the American Century TDFs beat the benchmark in 2055, 2050, 2045, 2040, 2035, 2030, 2025. FAC, Ex. I.

15

In short, Plaintiffs cannot support an inference of imprudence with charts that show the American Century TDFs routinely outperformed the very benchmark and the very competitors that Plaintiffs rely upon. *See Cho*, 2021 WL 4438186, at *9 (granting motion to dismiss where, *inter alia*, "Plaintiff admits that on several occasions the relevant funds outperformed their benchmarks"); *Antoine*, 2023 WL 6386005, at *11 ("Further undercutting Plaintiffs' underperformance-based theory is the fact that the TDFs did not *consistently* underperform relative to the Comparators throughout the Class Period.") (emphasis added).

What is more, the American Century TDFs trounced the benchmark every year that the benchmark was down, i.e., 2015, 2018, and 2022.  This reflects a more conservative strategy that minimizes risks to plan participants in down markets. That is an intrinsically reasonable choice. *See Pizarro v. Home Depot, Inc*., No. 22-13643, 2024 WL 3633379, at *9 (11th Cir. Aug. 2, 2024) ("In years when the equity market is hot, a more aggressive target date fund that retains equities longer will appear to outperform . . . .  But that snapshot does not mean it is objectively imprudent to adopt a more conservative strategy—the tables turn when the market is down.").  Moreover, it reflects precisely the type of "difficult trade off" that is best left to the fiduciaries' judgment. *Hughes*, 595 U.S. at 177.

Here, the reality of how the American Century TDFs performed—better than some of Plaintiffs' Comparator Funds and better than the Morningstar Benchmark

for many vintages over the Class Period, and consistent with a goal of better protecting retirement savings in down markets—is worlds away from what any person reasonably could describe as imprudent. *See Pizarro v. Home Depot, Inc.*, 634 F. Supp. 3d 1260, 1303 (N.D. Ga. 2022), *aff'd*, 2024 WL 3633379 (11th Cir. Aug. 2, 2024) (plaintiffs failed to establish imprudence where challenged fund underperformed in one year, but by the same metric, outperformed in another); *Patterson v. Morgan Stanley*, No. 16-cv-6568, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019) (finding no plausible allegation of imprudence because "[a]lthough the Mid Cap Fund lagged behind its alleged comparators in 2011, 2012, and 2014, it outperformed all of Plaintiffs' suggested alternative investments in 2013.").

**Finally**, Plaintiffs' comparisons are not statistically significant.  Notably, every single fund that Plaintiffs hold forth as a valid comparator (*i.e.*, funds that, according to Plaintiffs, Defendants should have selected instead of the American Century TDFs) had some moments when it stumbled.  For example, the MFS Lifetime TDF underperformed the benchmark and *all* of the other comparator funds (including the American Century TDFs offered by the Plan) in 2014 and 2023.  *See* FAC, Exs. A, J.  This illustrates a fairly obvious point: ups and downs are normal for all investments and do not show imprudence.  Indeed, "a fiduciary may – and often does – retain investments through a period of underperformance as part of a long-range investment strategy." *White I*, 2016 WL 4502808, at *17 (*citing Jenkins*

*v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006)); *Dorman v. Charles Schwab Corp.*, No. 17-CV-00285, 2018 WL 6803738, at *3 (N.D. Cal. Sept. 20, 2018) ("in choosing funds, a fiduciary considers not only modest differences in price and performance, but also other relevant factors, such as strategy, security lending practices, economic cycles, and market fluctuations. . . . For these reasons, funds may continue to hold a fund despite slight underperformance.").

Accordingly, courts do not infer underperformance from dips; they look for underperformance that has lasted for a long enough period, and that has been large enough, to be meaningful. In *Cho*, the court explained that Plaintiffs' claims failed because they were based on too short a time frame and differences in performance that were too minor. The same is true here.

To begin with, the *Cho* court explained that "three to five years is considered a relatively short period of underperformance that does not imply imprudence." 2021 WL 4438186, at *9 (citation omitted, cleaned up). Moreover, *Cho* explained that merely comparing "average annual returns" does not provide a sufficient time frame for comparison, as is needed to support an inference of imprudence. *Id.* (quoting and agreeing with *Patterson*, 2019 WL 4934834, at *1). Plaintiffs make the same mistakes here. They do not provide anything other than a series of one-year snapshots of performance. They do not allege anything whatsoever about how the American Century TDFs performed over periods of 3, 5, or 10 years, let alone

allege that the American Century funds underperformed over a meaningful period. Nor is it likely that Plaintiffs could so allege, given that their charts show many years where the American Century TDFs beat the comparators, the benchmark, or both.

Further, *Cho* explained that an underperformance of up to 3.71% (there, over a five-year period) was simply not large enough to infer that the decision to stick with the challenged fund was imprudent, given the normal ups and downs of reasonable investments.  *Cho*, 2021 WL 4438186, at *9. *See also Kistler v. Stanley Black & Decker, Inc.*, No. 3:22-CV-966, 2024 WL 3292543, at *11 (D. Conn. July 3, 2024) ("Courts have considered underperformance between 1-3% to be insufficient alone to support a claim of imprudence." (collecting cases)); *Bekker v. Neuberger Berman Group LLC*, No. 16-cv-6123, 2018 WL 4636841, at *2, *7 (S.D.N.Y. Sept. 27, 2018) (10-year annualized underperformance of 4.45% insufficient to state a claim).  Here, Plaintiffs do not allege the percentage differences (up or down) between the performance of the American Century TDFs and the Plaintiffs' comparators.  Nor are the amounts of differences in performance (up or down) readily apparent from their charts.  *See*, *e.g.*, Ex. B (comparators largely falling on scale of -1.5% to 1%).  In the absence of clear allegations, Plaintiffs cannot carry their burden to allege a meaningful variance in performance between the challenged funds and the proposed comparators.  *See K.J. v. Greater Egg Harbor Regional High School Bd. of Educ.*, No. 14-0145, 2015 WL 5039460, at *6 (D.N.J.

Aug. 26, 2015) (explaining that it is not the court's job to parse the complaint in search of facts that may support a legal claim).

**B.**     **Plaintiffs do not plausibly allege that Defendants breached their fiduciary duties by utilizing mutual fund versions of the American Fund TDFs instead of CIT alternatives.**

Plaintiffs erroneously assert that Defendants were imprudent simply because—between 2014 and 2017—Defendants chose a mutual fund version of the American Century TDFs. Plaintiffs' theory focuses myopically on allegations that the CITs would have been cheaper. *See*, *e.g.*, FAC ¶ 100 (CITs are "lower fee alternatives"); ¶ 101 (same). Indeed, according to Plaintiffs, not only must a plan use whatever product happens to cost less, but, moreover, the plan must jump to that product at the very first moment possible. FAC ¶ 102. But "nothing in ERISA requires every fiduciary to scour the market to find the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *see also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823-24 (8th Cir. 2018) ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice."). Plaintiffs' theory here is doubly flawed: it improperly focuses on price alone, and, moreover, it insists that the lowest price must be achieved immediately, meaning any investment would—absurdly—be deemed imprudent the moment a supposedly cheaper option was offered on the market. That is not the law. *Id.*

20

Moreover, there is good reason—which Plaintiffs wholly ignore—why CITs are not priced the same as mutual funds: CITs and mutual funds are very different products.  As the Third Circuit has explained, "[m]utual funds are organized as investment companies, which are governed by the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, and the Investment Company Act of 1940, 15 U.S.C. § 80a–1 *et seq.* . . .  Accordingly, they are subject to a variety of reporting, governance, and transparency requirements that do not apply to other investment vehicles such as commingled pools [aka CITs]."  *Renfro*, 671 F.3d at 318.  Thus, *mutual funds* afford material benefits and protections to consumers—benefits that CITs lack.  As such, courts routinely hold that, because CITs and mutual funds are different to the point where they cannot be fairly compared, Plaintiffs cannot state a claim based on allegations that a defendant could, in theory, have saved money by utilizing a CIT instead of a mutual fund.  For example, in *Davis v. Salesforce.com, Inc.*, No. 20-CV-01753, 2020 WL 5893405 (N.D. Cal. Oct. 5, 2020), the court dismissed an almost identical claim that Salesforce was imprudent for using mutual funds instead of CITs that were filed by the same plaintiffs' attorneys who now sue Cognizant, explaining that "collective trusts . . . differ so much from mutual funds . . . that other courts have found it impossible to make an 'apples-to-oranges' comparison of the two."  *Id.* at *6 (citation omitted);  *see also Matney v. Barrick Gold of N. Am., Inc.*, No. 20-CV-275, 2022 WL 1186532, at *8 (D. Utah Apr. 21, 2022) (same, granting motion to

21

dismiss complaint alleging that defendants were impudent for not selecting a CIT instead of a mutual fund), *aff'd sub nom. Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136 (10th Cir. 2023); *White I*, 2016 WL 4502808, at *12 (same). This shortcoming is fatal in the Third Circuit, which requires that plaintiffs challenging a plan's investment choices must allege "'a sound basis for comparison—a meaningful benchmark—to show a prudent fiduciary in like circumstances would have selected a different fund.'" *Cho*, 2021 WL 4438186, at *7 (quoting *Sweda*, 923 F.3d at 332).

Nor can Plaintiffs overcome this defect by sprinkling into their complaint naked assertions that Defendants "fail[ed] to adequately investigate the availability of identical lower cost American Century collective trusts" or failed to "timely consider" such options. To begin with, as the cases cited above demonstrate, given the unique pros/cons of mutual funds, plans are under no duty to consider the myriad products (ranging from REITS to CITs to gold bars) that might be substituted for them. *See Braden*, 588 F.3d at 596 n.7. In any event, the Court need not accept Plaintiffs' conclusory assertion that Defendants failed to consider alternatives, or failed to timely consider alternatives, to the mutual fund versions of the American Century TDFs, because that assertion is contradicted by specific, factual allegations in the FAC. *Cf. Milbrand v. Miner*, No. 17-cv-761, 2018 WL 4051747, at *7 (M.D. Pa. Aug. 24, 2018) (finding plaintiff's conclusory assertions insufficient, because claim was "completely undercut by the thrust of the allegations in his amended

complaint"). In particular, the FAC alleges that the Plaintiffs switched from the non-CIT American Century TDFs to the CIT American Century TDFs in 2017. FAC ¶ 102. The FAC further alleges that, in 2018, the Plan switched yet again, to the "American Century version of its target date funds with an expense ratio of only .23%," which Plaintiffs' themselves conceded was prudent. FAC ¶ 105 & n.10. These allegations not only belie Plaintiffs conclusory assertion that Defendants "did not consider" or "did not timely consider" CITs; they affirmatively demonstrate prudent conduct. *See White I*, 2016 WL 4502808, at *14 (the fact that defendants switched to cheaper share classes plausibly suggests prudent monitoring).

Plaintiffs again miss the mark by asking the Court to infer that Defendants were imprudent because they did not obtain the lowest-priced American Century TDFs (CITs) in 2017 but, rather, in 2018. Courts recognize that it takes time to negotiate and obtain price drops and do not treat this marketplace reality as a signifier of imprudence. *White I*, 2016 WL 4502808, at *14; *see also Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 708 (W.D. Mo. 2019) (a year delay in converting to lower cost share class was not imprudent).[4] Moreover, Plaintiffs

---

[4] Plaintiffs theorize that the Plan's 2017 CITs cost more than the Plan's 2018 CITs because the former were "branded" as MassMutual CITs. FAC ¶ 102. But the Court need not accept that allegation as true, because it is contradicted by the Plan's disclosures, which accurately identify American Century as the manager of these TDFs (in the case of the mutual funds) and Global Trust Company (the Trust advised by American Century) in the case of the CITs. *See* ECF No. 17-8, at 6-10 (7.27.18

fail to allege that the lower cost share class was actually available in 2017 (*i.e.*, that the Plan had sufficient assets to qualify for the shares). This also renders their claim implausible. *Johnson v. Parker-Hannifin, Corp.*, No. 21-cv-256, 2023 WL 8374525, at *11 (N.D. Ohio Dec. 4, 2023) (granting motion to dismiss due to insufficient allegations that share classes were available).

## III. PLAINTIFFS' CHALLENGE TO MASSMUTUAL FUNDS FAILS BECAUSE PLAINTIFFS LACK STANDING AND ALLEGE THAT THE MASSMUTUAL FUNDS SAVED THE PLAN MONEY.

### A. Plaintiffs lack standing to contest the MassMutual Funds.

For this Court to have jurisdiction over Plaintiffs' claims, Plaintiffs bear the burden to demonstrate that they have Article III standing, which requires that they allege a particularized injury that would be redressed by the relief sought. *See Perelman v. Perelman*, 793 F.3d 368, 373 (3d Cir. 2015) (affirming dismissal of ERISA claims for lack of standing). Absent an individualized injury in fact, a plan participant cannot assert representative standing based on injuries to the plan. *Thole v. U.S. Bank, N.A.*, 590 U.S. 538, 543 (2020). Here, Plaintiffs cannot establish injury in fact. First, none of the Plaintiffs invested in the five funds they challenge. *Compare* FAC ¶ 92 *with* FAC ¶¶ 22-27; *see also McCaffree Fin. Corp. v. ADP, Inc.*, No. 20-cv-5492, 2023 WL 2728787, at *5 (D.N.J. Mar. 31, 2023) ("To demonstrate

---

Disclosure). By contrast, the Select Mid-Cap Growth Fund, which is a MassMutual product, lists MassMutual as its investment manager. *Id.* at 11.

Article III standing, an ERISA plaintiff must demonstrate injury to his own plan account." (internal citation omitted)). Thus, Plaintiffs cannot establish an injury-in-fact based upon the five challenged funds themselves.

Nor can Plaintiffs establish standing by asserting that they suffered an injury-in-fact with respect to the American Century TDFs in which they did invest. *E.g*., FAC ¶ 23 ("Mr. Milano suffered injury to his Plan account due to significant underperformance of the American Century target dates."). That assertion is merely a legal conclusion masquerading as fact; Plaintiffs' factual allegations, as shown above (Point II.A, *supra*), establish that the American Century TDFs did not "underperform." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 n.55 (3d Cir. 2016) (plaintiff cannot "'rely on a bare legal conclusion to assert injury-in-fact'" (citation omitted)).

### B.    Plaintiffs fail to plausibly allege that Defendants' process for selecting the five challenged funds was imprudent.

Even if Plaintiffs had standing (they do not), they fail to state a claim because the specific allegations in the FAC show that MassMutual actually charged *less* for five challenged funds than what the Plan would have paid to acquire the same funds from another provider. That is because—as the FAC expressly concedes—the five funds that were acquired through MassMutual provided an *additional* economic benefit to Plan participants (known as "revenue sharing") that Plaintiffs ignore.

As noted above, "[r]evenue sharing is a common practice in which service

providers of mutual funds share a percentage of the fees they receive with the administrative-service provider of a particular plan which can help defray participants' recordkeeping and other administrative costs." *Rosen v. Prudential Ret. Ins. & Annuity Co.*, No. 15-CV-1839, 2016 WL 7494320, at *10 (D. Conn. Dec. 30, 2016), *aff'd*, 718 F. App'x 3 (2d Cir. 2017). In other words, rather than plan participants paying the Plan's recordkeeper directly (*e.g.*, a flat fee taken from their account) with "revenue sharing," the payments to recordkeeper are paid from a portion of a fee charged on a mutual fund instead. *See* FAC ¶ 111 ("Recordkeeping expenses can either be paid directly from plan assets, or indirectly from the higher expense ratios charged by the MassMutual branded funds."). As the Eighth Circuit explains, revenue sharing is an "acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir.), *cert. denied*, 574 U.S. 991 (2014); *Rosen*, 2016 WL 7494320, at *10 ("courts across the country" have approved of revenue sharing).

As the FAC admits, in this case, the challenged MassMutual funds included revenue sharing: "MassMutual also maintains multiple SIAs or sub-accounts of SIAs that invest in the same share class of a mutual fund, but will have a different expense ratio *and provide different levels of revenue sharing to MassMutual* as a result of the application of different fee amounts at the SIA or sub-account level (referred to as a 'wrap fee')." FAC ¶ 87 (emphasis added). By obtaining revenue

sharing, MassMutual ensured that the Plan was (1) paying less for the funds that MassMutual supplied to the Plan than (2) what the Plan would have paid, had the Plan obtained the same funds from another provider.

For example, Exhibit K to the Complaint shows that the Developing Markets (OFI) SIA-C has an expense ratio (sticker price) of 1.07% and then provides for .30% of revenue sharing (effectively, a rebate to Plan participants that pays for recordkeeping fees), meaning that the effective net cost to Plan participants of the Developing Marking (OFI) SIA-C is .77%. *See* FAC Ex. K, at 5. Plaintiffs allege that, if, instead of obtaining this fund from MassMutual, the Plan had shopped for an equivalent fund directly on the open market, then the Plan would have been able to purchase the "Invesco/Oppenheimer Developing Markets R6 with an expense ratio of .83%." FAC ¶ 93. In other words, that approach would have been ***more*** expensive for the Plan, costing it net .83% instead of the net .77% that the Plan actually paid. *Matney*, 80 F.4th at 1152 (affirming dismissal where "[t]he documents referenced in the complaint reveal the exact revenue credit used by the Plan and confirm it unquestionably yielded a lower cost share class fund for participants.").

At bottom, Plaintiffs provide the Court no basis to infer that Defendants' process was imprudent. Although Plaintiffs offer the speculation that MassMutual funds charged "excess expense" for which the Plan received no benefit (FAC ¶ 92), the Court need not accept such conclusory labels when the specific allegations of the

Complaint show that (1) the Plan did receive a benefit in the form of revenue sharing and thus (2) achieved a net savings. *See White v. Chevron Corp.*, No. 16-CV-0793, 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) (utilizing shares with revenue sharing "provides an 'obvious, alternative explanation' for why [Defendant chose] share classes of certain funds—those share classes paid the Plan's recordkeeping expenses before the Plan's fiduciaries negotiated a flat, per-participant fee"); *Boyette v. Montefiore Med. Ctr.*, No. 22-CV-5280, 2023 WL 7612391, at *6 (S.D.N.Y. Nov. 13, 2023) (granting motion to dismiss; in light of revenue sharing and there was "no question that the plaintiffs received a benefit from the higher cost share classes."). There is nothing imprudent about choosing a mutual fund option that simple arithmetic (and the basic accounting principle of netting) shows is cheapest. Nor is it surprising that hiring MassMutual would yield such monetary benefits; offering bulk pricing is a key way for firms like MassMutual to compete and thrive.

## IV.  PLAINTIFFS' CHALLENGE TO THE PLAN'S RECORDKEEPING FEES FAILS TO STATE A CLAIM

The FAC must contain allegations sufficient to show that Defendants' process for controlling its recordkeeping fees was imprudent. *See Brock v. Robbins*, 830 F.2d 640, 647-48 (7th Cir. 1987) (distinguishing between prudence of a fiduciary's process in agreeing to a fee and the reasonableness of the fee itself). Plaintiffs, however, provide no allegations concerning Defendants' process to ascertain and

constrain the compensation of its recordkeepers, regardless of whether the recordkeeper was MassMutual or, subsequently, Great West and Empower, the last of which Plaintiffs concede was charging a reasonable fee (FAC ¶ 130). Plaintiffs do not, for example, make allegations that Defendants failed to shop for recordkeepers through Requests for Proposal ("RFPs") or to test the market through Requests for Information ("RFIs") or benchmarking, let alone that Defendants failed to do so for many years at a time.[5] Plaintiffs make no allegations about whether Defendants negotiated for rebates from their recordkeepers (as shown, *supra* Factual Background Point I.A, they did) or obtained caps on their recordkeepers' compensation (again, they did, *id.*). Nor can Plaintiffs overcome these omissions, because the FAC provides no basis to infer imprudence.

*First*, to support an inference of imprudence by comparing the Plan's recordkeeping fees to those paid by other plans, Plaintiffs must establish that those "comparator" plans furnish a "meaningful benchmark." *Matney*, 80 F.4th at 1156-57; *Krutchen v. Ricoh USA, Inc.*, No. CV 22-678, 2022 WL 16950264, at *3 (E.D. Pa. Nov. 15, 2022). Plaintiffs fail to do so. Four of Plaintiffs' "comparisons" are so deeply flawed as to be meaningless, and the fifth actually cuts in Cognizant's favor.

---

[5] These are widely accepted, although not mandatory, means to select recordkeepers and/or control recordkeeping costs. *See* Amicus Brief of Chamber of Commerce of United States of America at 19, *Singh v. Deloitte LLP*, No. 21-cv-8458 (2d Cir. Feb. 9, 2024), ECF No. 91, 2024 WL 1953465, at *19.

- **The Deseret 401(k) Plan ("Deseret Plan").**  When Plaintiffs calculate the amount of recordkeeping fees that the Cognizant Plan paid, Plaintiffs included direct *and* indirect costs.  *See* FAC ¶ 121.  But, when Plaintiffs calculate the fees that the Deseret Plan paid its recordkeeper, Plaintiffs *exclude* indirect fees.  *See* FAC ¶ 123.[6]  As numerous courts have held, rigging the math in this way precludes an apples-to-apples comparison between the Deseret Plan and the Cognizant Plan and therefore cannot form the basis for a recordkeeping claim.  *Singh*, 650 F. Supp. 3d at 267 ("plaintiffs' comparison is disingenuous because it compares the combined direct and indirect costs of the 401(k) Plan to only the direct costs of the comparator plans"); *Mateya v. Cook Grp. Inc.*, No. 22-cv-1271, 2023 WL 4608536, at *8 (S.D. Ind. June 16, 2023) ("Comparing the direct and indirect fees of the Cook Plan [to] . . . direct fees from other plans will not suffice."); *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 166 (E.D.N.Y. 2022) (granting motion to dismiss;

---

[6] Plaintiffs arrive at their (underinclusive, understated) amount that the Deseret Plan supposedly paid to its recordkeeper by dividing the amount of *direct* compensation that the Deseret Plan paid ($773,763) by the number of plan participants in the Plan (34,938), to arrive at a hypothetical $22/per plan participant, but, as this math shows, no *indirect* compensation (which Deseret was, in fact, paid to its recordkeeper, Great West, as per its Form 5500) is included.  *See* Declaration of Alex Lakatos ("Lakatos Decl."), Ex. 1 (2019 Deseret 401(k) Plan Form 5500) at 6.

recordkeeping costs statistic that includes direct fees but omits indirect fees "provides little insight").

- **The Dow Chemical Companies Employees Savings Plan (the "Dow Plan").** When Plaintiffs calculate the fees that the Dow Plan paid its recordkeeper, they *once again* improperly exclude indirect fees. *See* FAC ¶ 123.[7]

- **The Savings and Investment Plan [WPP Group] (the "WPP Plan").** When Plaintiffs calculate the fees that the WPP Plan paid its recordkeeper, they *yet again* improperly exclude indirect fees. *See* FAC ¶ 123.[8]

- **The Danaher Corporation and Subsidiaries Savings Plan (the "Danaher Plan").** When Plaintiffs calculate the fees that the Danaher Plan paid its

---

[7] Plaintiffs arrive at the (underinclusive, understated) amount that the Dow Plan supposedly paid to its recordkeeper by dividing the amount of *direct* compensation that the Dow Plan paid ($932,742) by the number of plan participants in the Dow Plan (37,868), to arrive at a hypothetical $25/per plan participant, but, as this math shows, no *indirect* compensation (which the Dow Plan, in fact, paid to its recordkeeper, Fidelity, as per its Form 5500) is included. *See* Lakatos Decl., Ex. 2 (2019 Dow Chemical Company Employees' Savings Plan Form 5500) at 39.

[8] Plaintiffs arrive at the (underinclusive, understated) amount that the WPP Plan supposedly paid to its recordkeeper by dividing the amount of *direct* compensation that the WPP Plan paid to its recordkeeper, The Vanguard Group ($977,116) by the number of plan participants in the WPP Plan (35,927), to arrive at a hypothetical $27/per plan participant, but, as this math shows, no *indirect* compensation (which WPP paid to The Vanguard Group, as per its Form 5500) is included. *See* Lakatos Decl. Ex. 3 (2019 The Savings and Investment Plan [WPP] Plan Form 5500) at 6.

recordkeeper, they, *for a fourth time*, improperly exclude indirect fees.  *See* FAC ¶ 123.[9]

- **The Rite Aid 401(k) Savings Plan (the "Rite Aid Plan").**  Plaintiffs allege that a service provider that utilizes a code of 15 or 64 on the Plan's Form 5500 is a recordkeeper.  FAC ¶ 132 n.17 ("a service code of '15' and/or '64' . . . signifies recordkeeping fees").  This shows that the Rite Aid Plan actually had not one, but two, recordkeepers:  Alight *and* Northern Trust.  Both are well-known recordkeepers.  Yet, when Plaintiffs calculate the Plan's recordkeeping expenses, they include only the fees paid to Alight and exclude the fees paid to Northern Trust.[10]  This is no trivial omission.  Correcting for Plaintiffs' errors shows that the Rite Aid Plan paid $58.36/per plan participant

---

[9] Plaintiffs arrive at the (underinclusive, understated) amount that the Danaher Plan supposedly paid to its recordkeeper by dividing the amount of *direct* compensation that the Danaher Plan paid to its primary recordkeeper, Fidelity ($1,124,994), by the number of plan participants in the Danaher Plan (33,116), to arrive at a hypothetical $34/per plan participant, but, as this math shows, no *indirect* compensation (which the Danaher Plan paid to Fidelity, as per its Form 5500) is included.  *See* Lakatos Decl. Ex. 4 (2019 Danaher Corporation & Subsidiaries Savings Plan Form 5500) at 6.  Plaintiffs also ignore the fact that Danaher had a second recordkeeper—ADP—further understating what Danaher spent on recordkeeping.  *Id.*

[10] Unlike the rest of the comparators, Plaintiffs rely on, attached hereto as Exhibit 5 is a true and correct excerpt of the 2018 The Rite Aid 401(k) Plan Form 5500, Lakatos Decl., Ex. 5, instead of the 2019 filing.  Based on the 2018 filing, Plaintiffs flag Alight as the Plan's recordkeeper, and calculate the Plan's recordkeeping fees solely as what the Plan paid to Alight, (*i.e.*, $930,019).  *Id.* at 6.  But the Form 5500 shows that Northern Trust also was a Plan recordkeeper (service code of 15) and received payments of $712,798.

in 2019.[11]  This demonstrates that the $60.98 that Plaintiffs say Cognizant paid in 2019 is well within the bounds of reason.  *See, e.g., Pizzaro*, 2024 WL 3633379 at * 8 ("But even taking the plaintiffs' preferred approach for both variables—which unsurprisingly produces the worst outcome for Home Depot—the record shows that Home Depot's top-tier fee, measured in basis points, is by no means an outlier.").

Outside of comparators, Plaintiffs note that, in another case, Fidelity stipulated that its recordkeeping services were supposedly worth $14 to $21 (¶¶ 124-25), but "Fidelity took that position in litigation regarding the recordkeeping services it provided to *its own plans*," *Wehner v. Genentech, Inc.*, No. 20-CV-06894, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021), and thus the stipulation cannot be applied more broadly.[12]  *Id.*; *see also Mateya*, at *6 (same); *Fritton v. Taylor Corp.*, No. 22-CV-00415, 2022 WL 17584416, at *8 (D. Minn. Dec. 12, 2022) (Fidelity stipulation not a "meaningful benchmark"); *Sigetich v. Kroger Co.*, No. 21-CV-697,

---

[11] Further, if Plaintiffs were to have used the 2019 Form 5500 (as they did for all of the other comparators), then the price per plan participant would be $58/per plan participant:  $820,114 paid to Alight, plus $638,564 paid to Northern Trust, divided by 24,993 plan participants, which equals $58.36 per plan participant.  *See* Lakatos Decl. Ex. 6 (2019 The Rite Aid 401(k) Plan Form 5500) at 2, 6.

[12] Indeed, the value of the stipulation of evaluating even Fidelity's actual recordkeeping fees is undermined by the FAC. Even using Plaintiffs underestimated numbers, Fidelity was providing recordkeeping services to the Danaher Plan far more than discussed in the stipulation.

2023 WL 2431667, at *10 (S.D. Ohio Mar. 9, 2023); *Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 20-CV-01493, 2021 WL 3417843, at *4 (W.D. Pa. Aug. 3, 2021).

***Second***, while the Plaintiffs understate the amount paid for recordkeeping by the "comparator" plans, Plaintiffs overstate the amount that the Cognizant Plan paid for its recordkeeping fees. Plaintiffs take the direct fees that the Plan supposedly paid for recordkeeping straight from the Cognizant Plan's DOL Forms 5500. *Compare* FAC ¶ 121 with Lakatos Decl. Ex 7 (Cognizant 5500s). But those amounts include more than just recordkeeping. As the FAC acknowledges, MassMutual was not just a recordkeeper to the Plan; it also provided various investment products to the Plan. FAC ¶ 86 (alleging "funds offered by MassMutual"); ECF 17-8 (describing two funds in the Plan, the MassMutual Premier Inflation Protection bond offering and the MassMutual Select Mid Cap Growth fund, managed by MassMutual). Consistent with these allegations, the 5500s show that MassMutual was paid "investment management fees"[13] (denoted with a code 52).[14] Plaintiffs include these investment management fees as part of the direct amounts the Plan paid for recordkeeping, but, according to the FAC (¶¶ 112-14), investment management is not among the services that recordkeepers provide. And, unlike MassMutual,

---

[13] *See* Lakatos Decl. Ex 7 (Cognizant Technology Solutions 401(k) Savings Plan Forms 5500 for years 2014-2022).

[14] *See, e.g.*, Lakatos Decl. Ex. 8 (2019 Instructions for Form 5500: Annual Return/Report of Employee Benefit Plan) at 27.

recordkeepers on Plaintiffs' list of comparators that are not alleged to have served as investment managers (i.e., Fidelity for the Danaher Plan, Alight and Northern Trust for the Rite Aid Plan, Fidelity for the Dow Plan, and Great West for the Desert Plan) did not report receiving investment management fees. Consequently, Plaintiffs' calculation of the fees that the Plan supposedly paid MassMutual for recordkeeping is artificially inflated by the inclusion of these fees.

The fact that Plaintiffs numbers are artificially inflated is confirmed by the Plan's Participant Disclosures, which show that in September 2018, the Plan switched to a flat, per-participant recordkeeping fee of $42 per participant, then in March 2019 to $26 per participant, and then in September 2019 to $23 per participant. *See* ECF No. 17-8, at 13; 17-9, at 10; 17-10, at 10. Thus, Plaintiffs "calculated" 2019 recordkeeping fees ($60.80) are grossly overstated, as are Plaintiffs' 2020 and 2021 figures.[15] Indeed, Plaintiffs erred by including *any* indirect

---

[15] Plaintiffs failure to explain how they calculated their fees (especially given that their "calculations" are inconsistent with the Plan's disclosures) means that the FAC does not pass muster under the Supreme Court's "context specific" rubric. *Hughes*, 595 U.S. at 173; *see also Fritton*, 2022 WL 17584416, at *8 (criticizing lack of allegations "describing how" recordkeeping fees were calculated). Insofar as Plaintiffs may seek to rely on pre- or post-*Hughes* precedent to the contrary, it is wrongly decided in light of *Hughes.* Nor can mystery "math," at odds with Plan disclosures, satisfy *Iqbal*'s "plausibility" standard. *Jones v. Dish Network Corp.*, No. 22-cv-167, 2023 WL 2796943, at *9 (D. Colo. Jan. 31, 2023), *report and recommendation adopted*, 2023 WL 2644081 (D. Colo. Mar. 27, 2023) (Plaintiffs' inconsistent math rendered recordkeeping comparators implausible).

fees in 2019, 2020, and 2021 without acknowledging that total fees were capped.

*Third*, evaluating the Complaint holistically, it becomes even more apparent that Plaintiffs fail to state a claim. To begin with, Plaintiffs had literally hundreds, if not thousands, of plans from which to choose to find a mere five "comparators." FAC ¶ 84. That Plaintiffs could not find *any* plans that are valid comparators, and even included a plan whose recordkeeping costs were on par with the Cognizant Plan, is greater than the sum of its parts: it shows that Plaintiffs' claim is illusory. That conclusion is compounded by the fact that Plaintiffs have unceremoniously ditched *all* comparator plans they used in their original complaint. *Compare* Compl. ¶¶ 99-102 with FAC ¶ 123. If Plaintiffs truly believed they could make their case without cherry-picking and the benefit of hindsight, they would have stuck with their original slate of comparators. Plaintiffs similarly abandoned their reliance on the 401(k) Averages Book (*see* Compl. ¶ 103) after Cognizant demonstrated that the 401(k) Averages Book actually established that plans like the Cognizant Plan pay an average of $165/per person for recordkeeping. ECF No. 16, at 33-34.

What is more, Plaintiffs allege that Defendants switched recordkeepers from MassMutual to Great West to Empower (FAC ¶ 121 & ns. 14, 15), which courts recognize as evidence of prudent action. *See*, *e.g.*, *White I*, 2016 WL 4502808, at *14 (dismissing recordkeeping claim where plan fiduciaries renegotiated recordkeeping fees during the class period, which "plausibly suggest[s] that

36

defendants were monitoring recordkeeping fees to ensure that they did not become unreasonable"); *see also Nunez*, 2023 WL 5339620, at *12 (holding that Committee's "process of monitoring recordkeeping fees and selecting a new recordkeeper was reasonably prudent" in part because Committee "clearly negotiated down the Plan's recordkeeping fees per participant on numerous occasions"). That evidence of prudence is especially important here, because Plaintiffs offer no countervailing allegations concerning Defendants' process.

Even Plaintiffs' owns statistics—flawed as they are—show a wider context fully consistent with prudent conduct. For example, Plaintiffs allege that recordkeeping prices are "driven by the number of participants in a plan" (FAC ¶ 116) and that the number of participants in the Cognizant Plan more than doubled between 2021 and 2022 (from 45,254 to 92,372, FAC ¶ 121), at which point the Plan entered into the elite club of plans with over 50,000 plan participants (FAC ¶ 13); accordingly, one might expect a prudent fiduciary to realize savings in 2022. And Plaintiffs' chart proclaims that is exactly what happened. FAC ¶ 121. *See Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 300-01 (S.D.N.Y. 2018), *aff'd*, 9 F.4th 95 (2d Cir. 2021) (negotiation of recordkeeping fee reductions "while the number of plan participants and total Plan assets increased" reflected prudent process).

Plaintiffs similarly allege that there is a "general trend towards lower recordkeeping expenses in the marketplace as a whole" (FAC ¶ 131) with

recordkeeping "costs coming down every day" (FAC ¶ 127); accordingly, one might expect a prudent fiduciary to realize savings over time—and, again, that is what Plaintiffs' chart shows, with Plaintiffs alleging that the Plan's recordkeeping costs came down each and every year from 2018 to 2022. *Johnson*, 2021 WL 3417843, at *4 ("the fact that the Plan's recordkeeping fees trend downward for the period at issue [from $58 to $51 between 2014 and 2018] signals prudence rather than imprudence"); *Matney*, 80 F.4th at 1156 (affirming dismissal of recordkeeping claims where allegations show "the Plan's recordkeeping fees became cheaper over time," from $101 in 2014, to $85 in 2015, to $68 in 2017, to $53 in 2020).

In sum, drilling down shows that each of Plaintiffs' comparators and each of Plaintiffs' numbers is deeply flawed. And, on the other side of the coin, zooming out shows that Plaintiffs have said much to affirmatively confirm that Defendants' conduct was prudent. For both of these mutually reinforcing reasons, Plaintiffs' recordkeeping claim must be dismissed.

## V.  PLAINTIFFS' CLAIM AGAINST COGNIZANT AND THE BOARD FOR FAILURE TO MONITOR SHOULD BE DISMISSED.

First, Plaintiffs' failure to monitor claims must be dismissed, because, as shown above, Plaintiffs fail to allege an underlying violation of law. *Scalia v. WPN Corp.*, 417 F. Supp. 3d 658, 669 (W.D. Pa. 2019) ("[T]o be liable for the failure to monitor, there must be an 'underlying breach of the duties imposed under ERISA.'" (quoting *In re Allergan ERISA Litig.,* No. 17-1554, 2018 WL 8425676, at *7 (D.N.J.

July 2, 2018), *aff'd*, 975 F.3d 348 (3d Cir. 2020)).

Second, Plaintiffs fail to include any specific, factual allegations regarding Cognizant's (or the Board's) monitoring process or how the process was deficient. Instead, they offer only the naked conclusion that Cognizant and the Board failed to monitor the Committee. FAC ¶ 143. Such allegations that "only in the most general terms [assert] that the [defendants] breached their duty to monitor" fail to state a claim. *Neil v. Zell*, 677 F. Supp. 2d 1010, 1024 (N.D. Ill. 2009), *as amended* (Mar. 11, 2010); *In re Nokia ERISA Litig.*, No. 10-cv-3306, 2011 WL 7310321, at *5 (S.D.N.Y. Sept. 6, 2011) (dismissing for failure to allege a "specific factual basis to support [a] conclusory allegation of a lack of legally sufficient monitoring").

Third, the Plaintiffs fail to plausibly allege that the Board is a fiduciary with any duty to monitor the Committee. Plaintiffs rest their position that the Board was such a fiduciary on their allegation that "[t]he Company, acting through its Board of Directors, appointed the Committee." FAC ¶ 32 (citing Plan Document, ECF No. 17-16, at 110). But the Plan Document that Plaintiffs cite does not support Plaintiffs' allegation that the Board had authority to appoint, monitor, and/or remove the Committee. ECF No. 17-16, at 110-13. It does not even list the Board as a Plan fiduciary. *Id.* at 117. This Court therefore need not accept Plaintiffs' allegation that the Board had fiduciary authority over the Committee. *See Robern, Inc. v. Glasscrafters, Inc.*, 206 F. Supp.3d 1005, 1008 (D.N.J. 2016) ("a court is not

compelled to accept unwarranted inferences [or] unsupported conclusions" (quotation and citation omitted)). The claim against the Board should be dismissed. *See IJKG Opco LLC v. Gen. Trading Co.*, No. 17-6131, 2020 WL 1074905, at *4, *7 (D.N.J. Mar. 6, 2020) (dismissing complaint alleging fiduciary status where "[m]ore [was] needed to demonstrate that [defendant] had any sort of discretionary authority with respect to this claim"). Plaintiffs similarly allege that the Company was a fiduciary through the Board (FAC ¶ 32-33), which fails for the reasons above, and that the Company made decisions about profit sharing and employer matching contributions (FAC ¶ 34), but "decisions related to profit sharing contributions and company matching contributions [are] 'not functions undertaken in the Company's role of plan administrator and do not implicate ERISA's fiduciary duties.'" *Cottillion v. United Refin. Co.*, 279 F.R.D. 290, 309 (W.D. Pa. 2011) (quoting *In re RCN Litig.,* No. 04-5068, 2006 WL 753149, at *6 n.4 (D.N.J. Mar. 21, 2006)).

## CONCLUSION

For the foregoing reasons, the First Amended Complaint should be dismissed.

Dated:  August 15, 2024          By: /s/ Bryan Nese

Bryan Nese
  bnese@mayerbrown.com
Alex Lakatos
  alakatos@mayerbrown.com
1999 K Street NW
Washington, DC 20006
Telephone: (202) 263-3000

Nancy Ross
  *nross@mayerbrown.com*
71 South Wacker Drive
Chicago, IL 60606-4637
Telephone: (312) 782-0600

*Counsel for Defendants.*