## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MARK MILANO, ROBERT CAMERON, RODNEY HERGENRADER, KATHERINE H. JONCAS and CHARLES VAN HOOSER, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | **CIVIL ACTION NO.:** 2:20-cv-17793-KM-ESK |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, THE BOARD OF DIRECTORS OF COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, THE 401(K) INVESTMENT COMMITTEE OF COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION and JOHN DOES 1-30. | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  STANDARD OF REVIEW .................................................................................2

III. STATEMENT OF FACTS ...................................................................................4

    A.   The Plan and the Parties ...........................................................................4

    B.   Defendants' Imprudent Processes ...........................................................5

    C.   The Plan's Target Date Funds ..................................................................6

    D.   The Identical Lower Cost Alternative Funds ..........................................7

        1.   The Lower Cost Unbranded Funds ...............................................7

        2.   Lower Cost CITs ...........................................................................8

    E.   The Plan's Excessive RKA Fees ...........................................................10

IV. ARGUMENT......................................................................................................12

    A.   The Plan's RKA Fees Were Excessive .................................................12

        1.   Defendants' Imprudent Processes...............................................13

        2.   The Complaint's Plausible Fee Comparisions.........................16

            i.   The Comparator Plans ......................................................17

            ii.   The Plan's History .........................................................22

    B.   The Plan's Excessive Investment Fees .................................................24

        1.   Plaintiffs' Standing Regarding the Mass Mutual Funds...........26

        2.   The Unbranded Mutual Fund Alternatives ...............................28

3.    The Lower Cost CITs..................................................................30

C.    The Underperforming TDFs....................................................34

1.    Defendants' Imprudent Processes...............................34

2.    Plaintiffs Allege Meaningful Comparators.............................35

3.    The Degree of Underperformance is Sufficiently Alleged.......37

D.    Plaintiffs' Derivative Duty to Monitor Claim....................................40

V.    CONCLUSION................................................................................40

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Anderson v. Coca-Cola Bottlers' Ass'n*,
No. 21-cv-2054, 2022 WL 951218 (D. Kan. Mar. 30, 2022) .................................31

*Antoine v. Marsh & McLennan Companies, Inc.,*
No. 22-cv-6637, 2023 WL 6386005 (S.D.N.Y. Sept. 30, 2023) .............................38

*Bekker v. Neuberger Berman Grp. LLC*,
No. 16-cv-6123, 2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018) .............................39

*Berkelhammer v. Automatic Data Processing, Inc.*,
No. 20-cv-5696, 2022 WL 3593975 (D.N.J. Aug. 23, 2022) ............... 17, 38, 29, 40

*Binder v. PPL Corp.,*
No. 5:22-CV-00133, 2024 WL 1096819 (E.D. Pa. Mar. 12, 2024) ............... *Passim*

*Boley v. Universal Health Servs.*,
36 F.4th 124 (3d Cir. 2022) ....................................................................... 2, 26, 40

*Boyette v. Montefiore Med. Ctr.*,
No. 22-cv-5280, 2023 WL 7612391 (S.D.N.Y. Nov. 13, 2023) .............................29

*Brotherston v. Putnam Invs., LLC*,
907 F.3d 17 (1st Cir. 2018) .....................................................................................36

*Cassell v. Vanderbilt Univ.*,
No. 16-cv-2086, 2018 WL 5264640 (M.D. Tenn. Oct. 23, 2018) ..........................27

*Chandra v. Brown-Davis*,
No. 19-cv-05392, 2020 WL 8921399 (N.D. Ill. Mar. 16, 2020) .............................36

*Cho v. Prudential Ins. Co. of Am.,*
No. 19-cv-19886, 2021 WL 4438186 (D.N.J. Sept. 27, 2021) .................. 32, 36, 39

*Davis v. Salesforce.com, Inc.*,
No. 21-cv-15867, 2022 WL 1055557 (9th Cir. Apr. 8, 2022)..................................31

*Dearing v. IQVIA Inc.*,
No. 20-cv-574, 2021 WL 4291171 (M.D.N.C. Sept. 21, 2021) ..............................36

*Dover v. Yanfeng US Auto. Interior Sys. I LLC*,
563 F. Supp. 3d 678 (E.D. Mich. 2021).............................................................2, 36

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ..............................................................................................2, 3

*Fitzpatrick v. Nebraska Methodist Health System, Inc.*,
No. 23-cv-27, 2023 WL 5105362 (D. Neb. Aug. 9, 2023)....................................37

*Gaines v. BDO USA, LLP*,
No. 22 C 1878, 2023 WL 2587811 (N.D. Ill. Mar. 21, 2023)................................36

*Garcia v. Alticor, Inc.*,
No. 20-cv-1078, 2021 WL 5537520 (W.D. Mich. Aug. 9, 2021) ..........................34

*Garnick v. Wake Forest Univ. Baptist Med. Ctr.*,
629 F. Supp. 3d 352 (M.D.N.C. 2022) ........................................................... 20, 21

*George v. Kraft Foods Glob., Inc.*,
641 F.3d 786 (7th Cir. 2011) .................................................................................11

*Hay v. Gucci America, Inc., et al.*,
2018 WL 4815558 (D.N.J. Oct. 3, 2018)...............................................................24

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) .................................................................................25

*Hughes v. Nw. Univ.*,
142 S. Ct. 737 (2022) (*Hughes I*)......................................................... 2, 30, 32, 39

*Hughes v. Nw. Univ.*,
63 F.4th 615 (7th Cir. 2023) (*Hughes II*).......................................................*Passim*

*Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*,
250 F. Supp. 3d 460 (N.D. Cal. 2017) ....................................................................33

*Johnson v. Parker-Hannifin, Corp.*,
No. 21-cv-256, 2023 WL 8374525 (N.D. Ohio Dec. 4, 2023) ................................33

*Johnson v. PNC Fin. Servs. Grp., Inc.*,
No. 20-cv-01493, 2021 WL 3417843 (W.D. Pa. Aug. 3, 2021) ...................... 23, 24

*Kistler v. Stanley Black & Decker*, Inc.,
No. 22-cv-966, 2024 WL 3292543 (D. Conn. July 3, 2024)..................... 15, 35, 39

*Knudsen v. MetLife Group, Inc.*,
No. 23-cv-00426, 2023 WL 4580406 (D.N.J. July 18, 2023) ................................27

*Kohari v. MetLife Grp., Inc.*,
21-cv-6146, 2022 WL 3029328 (S.D.N.Y. Aug. 1, 2022) .....................................35

*Kruchten v. Ricoh USA, Inc.*,
No. 23-cv-1928, 2024 WL 3518308 (3d Cir. July 24, 2024) ........................*Passim*

*Krutchen v. Ricoh USA, Inc.*,
No. 22-cv-678, 2022 WL 16950264 (E.D. Pa. Nov. 15, 2022)..............................17

*Larson v. Allina Health Sys.*,
350 F. Supp. 3d 780 (D. Minn. 2018).....................................................................27

*Leber v. the Citigroup 401(k) Plan Investment Committee*,
323 F.R.D. 145 (S.D.N.Y. 2017) ...........................................................................27

*Lopez v. Embry-Riddle Aeronautical Univ., Inc.*,
No. 22-cv-1580, 2023 WL 7129858 (M.D. Fla. July 12, 2023).............................27

*Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*,
541 F. Supp. 3d 496 (D.N.J. 2021) ........................................................................27

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023) ....................................................................... 17, 23

*Matney v. Barrick Gold of N. Am., Inc.,*
No. 20-cv-275, 2022 WL 1186532 (D. Utah Apr. 21, 2022) .................................31

*Mator v. Wesco Distribution, Inc.,*
102 F.4th 172 (3d Cir. 2024) ..........................................................................*Passim*

*McCool v. AHS Mgmt. Co., Inc.,*
No. 19-cv-01158, 2021 WL 826756 (M.D. Tenn. Mar. 4, 2021)...........................25

*McDonald v. Lab'y Corp. of Am. Holdings,*
No. 22-cv-680, 2023 WL 4850693 (M.D.N.C. July 28, 2023) ..............................21

*McGowan v. Barnabas Health, Inc.,*
No. 20-cv-13119, 2021 WL 1399870 (D.N.J. Apr. 13, 2021) ...............................27

*Miller v. Astellas US LLC,*
No. 20-cv-3882, 2021 WL 1387948 (N.D. Ill. Apr. 13, 2021)...............................39

*Moitoso v. FMR,*
451 F.Supp.3d 189 (D. Mass. 2020) .....................................................................11

*Moore v. Humana, Inc.,*
No. 21-cv-232, 2022 WL 20766504 (W.D. Ky. Dec. 2, 2022) ....................... 16 ,22

*Muri v. Nat'l Indem. Co.,*
No. 17-cv-178, 2018 WL 1054326 (D. Neb. Feb. 26, 2018)........................... 34, 39

*In re Mutual Funds,*
529 F.3d 207 (4th Cir. 2008) ................................................................................26

*Nicolas v. Trustees of Princeton Univ.,*
No. 17-cv-3695, 2017 WL 4455897 (D.N.J. Sept. 25, 2017)......................... 15, 35

*Nunez v. B. Braun Med., Inc.,*
2023 WL 5339620 (E.D. Pa. Aug. 18, 2023) ..................................... 16, 31, 33, 35

*Perelman v. Perelman,*
793 F.3d 368 (3d Cir. 2015) .................................................................................26

*Perkins v. United Surgical Partners*,
No. 23-cv-10375, 2024 WL 1574342 (5th Cir. Apr. 11, 2024)................... 8, 14, 24

*Peterson, et al. v. Insurance Offices, Inc., et al.*,
2021 WL 1382168 (D.N.J. April 13, 2021)......................................................*Passim*

*Pinnell v. Teva Pharms. USA, Inc.*, No. 19-cv-5738, 2020 WL 1531870 (E.D. Pa.
Mar. 31, 2020)........................................................................................................20

*Pizarro v. Home Depot, Inc.*,
No. 22-cv-13643, 2024 WL 3633379 (11th Cir. Aug. 2, 2024) ...................... 20, 38

*In re Quest Diagnostics Inc. ERISA Litig.*,
No. 20-cv-07936, 2021 WL 1783274 (D.N.J. May 4, 2021) ................................25

*Riley v. Olin Corp.*,
No. 21-cv-01328, 2023 WL 371872 (E.D. Mo. Jan. 24, 2023)..............................36

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
No. 15-cv-1839, 2016 WL 7494320 (D. Conn. Dec. 30, 2016),
*aff'd*, 718 F. App'x 3 (2d Cir. 2017)......................................................................30

*Russell v. Illinois Tool Works, Inc.*,
No. 22-cv-2492, 2024 WL 2892837 (N.D. Ill. June 10, 2024) ..............................36

*Sacerdote v. N.Y. Univ.*,
9 F.4th 95 (2d Cir. 2021) ........................................................................................3

*Sellers v. Trustees of Coll.*,
No. 22-cv-10912, 2022 WL 17968685 (D. Mass. Dec. 27, 2022) ................... 35, 40

*Silva v. Evonik Corp.*,
No. 20-cv-2202, 2020 WL 12574912 (D.N.J. Dec. 30, 2020) ............ 15, 20, 24, 35

*Snyder v. UnitedHealth Grp., Inc.*,
No. 21-cv-1049, 2021 WL 5745852 (D. Minn. Dec. 2, 2021)...............................36

*Somers v. Cape Cod Healthcare, Inc.*,
No. 23-cv-12946, 2024 WL 4008527 (D. Mass. August 30, 2024) ................ 20, 35

*Stengl v. L3Harris Techs., Inc.*,

No. 22-cv-572, 2023 WL 2633333 (M.D. Fla. Mar. 24, 2023) ............................. 21

*Sweda v. Univ. of Pennsylvania*,
923 F.3d 320 (3d Cir. 2019) ........................................................................ *Passim*

*Teodosio v. DaVita, Inc.*,
684 F. Supp. 3d 1117 (D. Colo. 2023) ..................................................... 21

*Thole v. U.S. Bank, N.A.*,
590 U.S. 538, 543 (2020) ................................................................ 26, 27

*Thomson v. Caesars Holdings Inc.*,
661 F. Supp. 3d 1043 (D. Nev. 2023) ..................................................... 35

*Tibble v. Edison Int'l*,
135 S. Ct. 1823 (2015) ............................................................................. 3

*Tibble v. Edison Int'l*,
843 F.3d 1187 (9th Cir. 2016) ........................................................... 24

*Tibble v. Edison Int'l*,
729 F.3d 1110 (9th Cir. 2013) ........................................................... 33

*Trauernicht v. Genworth Fin. Inc.*,
No. 22-cv-532, 2023 WL 5961651 (E.D. Va. Sept. 13, 2023) ................... 6, 35, 39

*Tussey v. ABB, Inc.*,
746 F.3d 327, 336 (8th Cir.), *cert. denied*, 574 U.S. 991 (2014) ........................... 28

*In re Unisys Savings Plan Litigation*,
74 F.3d 420 (3d Circ. 1996) ....................................................................... 5

*White, et al. v. Chevron Corp.*,
2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ...................................... 16

*White v. Chevron Corp.*,
No. 16-cv-0793, 2017 WL 2352137 (N.D. Cal. May 31, 2017)
*aff'd*, 752 F. App'x 453 (9th Cir. 2018) ................................................. 29

**Other Sources**

401(k) Averages Book ........................................................................................21

Employee Retirement Income Security Act of 1974 ......................................*Passim*

Restatement (Third) of Trusts § 100 cmt. ...............................................................9

Plaintiffs Mark Milano, Robert Cameron, Rodney Hergenrader, Katherine H. Joncas, and Charles Van Hooser (hereinafter "Plaintiffs"), respectfully submit this Opposition to Defendants'[1] Motion to Dismiss and supporting Memorandum ("Defs. Mem.") (ECF No. 81).

## I.    INTRODUCTION

Viewing Plaintiffs' First Amended Complaint holistically, it is clear that Defendants breached their fiduciary duties owed to the Plan throughout the Class Period. Specifically, Defendants failed to: (1) adequately review the Plan's investment portfolio to ensure that each investment option was prudent, in terms of cost and/or performance; and (2) control the Plan's recordkeeping and administrative ("RKA") fees. *See* First Amended Complaint ("Complaint" or "FAC") (ECF No. 73), ¶166.

Defendants support their motion to dismiss by improperly isolating and criticizing each allegation separately, using factual inaccuracies and relying on outdated caselaw. Defendants' rationale is contradicted by the pleadings, especially when properly evaluating the Complaint under ERISA's "holistic approach." *Mator v. Wesco Distribution, Inc*., 102 F.4th 172, 190 (3d Cir. 2024). Conspicuously absent from Defendants' Memorandum is any reference to the string of precedential Third

---

[1] "Defendants" refer to Cognizant Technology Solutions ("Cognizant"), The Board of Directors of Cognizant, The 401(k) Investment Committee of Cognizant Technology Solutions U.S. Corporation ("Committee"), and John Does 1-30.

Circuit Court of Appeals decisions regarding the pleadings stage of similar allegations involving revenue sharing, excessive RKA and investment fees, and Article III Standing. *See, e.g., Sweda v. Univ. of Pennsylvania,* 923 F.3d 320 (3d Cir. 2019); *Boley v. Universal Health Servs.*, 36 F.4th 124 (3d Cir. 2022); *Mator*; *Kruchten v. Ricoh USA, Inc.*, No. 23-cv-1928, 2024 WL 3518308 (3d Cir. July 24, 2024). Defendants' faulty arguments are the same arguments that the Third Circuit has repeatedly struck down in recent years, because they would improperly raise the pleading standard from "possible to *probable*", rather than the correct "conceivable to *plausible*" standard. *Mator*, 102 F.4th at 189 (emphasis in original). While each of Plaintiffs' allegations plausibly alleges different courses of Defendants' imprudent conduct, it is the totality of these allegations that demonstrate an all-encompassing breach by Defendants. For these reasons, Plaintiffs request that this Court deny Defendants' Motion to Dismiss in its entirety.

## II.    STANDARD OF REVIEW

At the motion to dismiss stage, "[c]ourts accept the factual allegations as true and view them in the light most favorable to the plaintiff." *Mator*, 102 F.4th at 178. The Supreme Court has repeatedly held that "[b]ecause the content of the duty of prudence turns on 'the circumstances ... prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022) (*Hughes I*) (quoting *Fifth Third Bancorp v.*

*Dudenhoeffer*, 573 U.S. 409, 425 (2014)). The Supreme Court has also held that ERISA does not grant fiduciaries a "defense-friendly standard", meaning there is no "presumption of prudence" when ruling on a motion to dismiss. *Bancorp*, 573 U.S. at 412; *see also Sweda*, 923 F.3d at 333 ("while fiduciaries have discretion in plan management, that discretion is bounded by the prudent man standard."). ERISA's duty of prudence applies to the initial selection and continuous monitoring of investments for potential removal. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29 (2015); *Mator,* 102 F.4th at 191; *Sweda*, 923 F.3d at 328.

ERISA's "holistic approach," to evaluating complaints means that "[t]he complaint should not be 'parsed piece by piece to determine whether each allegation, in isolation, is plausible.'" *Mator,* 102 F.4th at 190 (quoting *Sweda*, 923 F.3d at 331-32). Furthermore, courts "are cognizant that ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir. 2021) (citations omitted). Accordingly, "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct." *Id*. Thus, "a plaintiff alleging an ERISA fiduciary breach need not 'rule out every possible lawful explanation for the conduct he challenges.'" *Mator,* 102 F.4th at 184 (listing appellate court cases); *see also Sweda*, 923 F.3d at 326 ("[r]equiring a plaintiff to rule out every possible

lawful explanation for the conduct he challenges would invert the principle that the complaint is construed most favorably to the nonmoving party.").

## III. STATEMENT OF FACTS

### A. The Plan and the Parties

*The Plan*. The Plan grew from having $410 million dollars in assets under management and 18,979 participants in 2014, to having $2.2 billion dollars in assets under management and 92,372 participants in 2022. *See* FAC, ¶¶10-13. In 2017 and 2019, only 0.1% of plans were as large as the Plan. *Id*. As of the end of 2022, there were only 47 retirement plans with 90,000 or more participants. *Id*., ¶14. As a large plan, the Plan had substantial bargaining power to lower RKA and investment fees. *Id*. at ¶12.

*Plaintiffs.* Plaintiffs are participants in the Plan who invested the challenged American Century TDFs and suffered further injury to their Plan accounts by being overcharged for their share of RKA costs. FAC, ¶¶23-27.

*Defendants.* Cognizant, through its Board of Directors, appointed the Committee to oversee "the investment of Plan assets … consistent with the funding policy of the Plan and the requirements of ERISA." FAC, ¶31 (quoting The Massachusetts Mutual Life Insurance Company Volume Submitter Profit Sharing/401(k) Plan, as amended and restated effective May 1, 2020 ("Plan Doc.") at 110).

### B.    Defendants' Imprudent Processes

As a threshold matter, "[r]esponsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' …", particularly the costs. FAC, ¶69 (quoting Department of Labor 408(b)(2) Regulation Fact Sheet). Fiduciaries who engage a third-party advisor remain ultimately liable for making informed decisions regarding plan investments. *Id.*, ¶¶76-77; *see also In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996) (Plan fiduciaries must conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties."). In August of 2020, Plaintiffs wrote to Defendants to request internal documents involving the details of the Plan's administration, such as meeting minutes. FAC, ¶66. Cognizant denied Plaintiffs' request. *Id.* Accordingly, the Complaint draws numerous reasonable inferences regarding the Plan and Defendants' processes. *Id.*, ¶68.

Defendants' imprudent processes include their failure to investigate and replace the Plan's mutual funds with available identical versions that differed only in price and branding, based on the unfounded assumption that the higher cost would offset RKA fees. FAC, ¶¶79, 92, 117-18. In reality, the Plan still paid excessive RKA fees on top of the extra investment expenses. *Id.* Additionally, Defendants failed to prudently act on cyclical information regarding the Plan's chronically underperforming suite of target date funds. *Id.*, ¶85. Had Defendants adhered to the

prevailing fiduciary standard of prudence, they would have recognized these injurious circumstances and avoided harm to the Plan. *Id*., ¶166.

## C.    The Plan's Target Date Funds

Prudent fiduciaries monitor the performance of a plan's investments' returns using appropriate industry-recognized benchmarks and prudently managed equivalents. FAC, ¶¶72-74. Fiduciaries primarily use data driven methodologies to investigate funds, including data provided by Morningstar, the most accepted source of investment data. *Id*., ¶75. *See, e.g., Dover v. Yanfeng US Auto. Interior Sys. I LLC*, 563 F. Supp. 3d 678, 688 (E.D. Mich. 2021) ("parties in similar ERISA actions routinely reference these [Morningstar] indexes, or expert testimony that cites these indexes, to allege a breach of duty.") (listing cases). During the Class Period, the Plan offered the American Century Target Date Fund suite (the "Century TDFs").[2] Since 1994, there has been a large market for TDFs, with multiple investment institutions offering TDFs with strong performance histories and experienced management. *Id*., ¶¶82-83. In short, prudent alternatives to the Plan's TDFs were easily discoverable.

Exhibits A-J of the Complaint compares the Century TDFs against six individual TDF suites with reputable investment managers (the "Comparator

---

[2] TDFs "are portfolios of underlying funds that gradually shift to become more conservative as the assumed target date approaches." *Trauernicht v. Genworth Fin. Inc.*, No. 22-cv-532, 2023 WL 5961651, at *1 (E.D. Va. Sept. 13, 2023).

Funds") that were placed in the same Morningstar peer grouping as the Century TDFs, as well as the appropriate Morningstar benchmark for all funds in the Morningstar Category. FAC, ¶84. The vintages included in the exhibits are 2020 through 2050. *Id*. No two TDF suites are identical, however, per Morningstar peer grouping, the Comparator Funds are/were materially similar enough to replace the Century TDFs the Plan's overall investment menu. *Id*., ¶84. The Century TDFs underperformed the Comparator Funds and the Morningstar Benchmark each year from 2014 through at least 2023. *Id*., ¶¶81, 85, Exhibits A-J.

### D.    The Identical Lower Cost Alternative Funds

#### 1.    The Lower Cost Unbranded Funds

Defendants failed to implement lower cost versions of the MassMutual funds already in the Plan. FAC, ¶86. The lower cost alternative funds are identical in every respect except that they do not bear the MassMutual name, because MassMutual engages in a rebranding process whereby it contracts with providers of mutual funds to offer the provider's funds as a MassMutual product. *Id*., ¶¶86-92 (citing "A review of the Menu of Available Investment Options" published by MassMutual). The funds have identical investments, managers, risk profiles and investment strategies. *Id*. However, the higher expense ratio funds "provide different levels of revenue sharing to MassMutual." *Id*. Because the branded products chosen by Defendants were the same in every way except price to their less expensive counterparts, the

costlier funds **could not have** (1) higher returns, (2) lower risk, or (3) more services. *Id*., ¶97; *see also Perkins v. United Surgical Partners*, No. 23-cv-10375, 2024 WL 1574342, at *3 (5th Cir. Apr. 11, 2024) (upholding similar allegations). In short, the higher costs paid by Plan participants did not come with any additional services or benefits. *Id*.

In 2018, five of the Plan's MassMutual funds harbored over 81 million dollars, meaning the Plan met the required investment minimum to invest in the unbranded versions. FAC, ¶¶91-92. In 2018, the difference in expenses between the Plan's version versus the lower-cost unbranded versions were as high as 74%. *Id*. Had the Plan's fiduciaries prudently fulfilled their fiduciary responsibility for "determin[ing] the appropriateness of the Plan's investment strategy, and monitor[ing] investment performance" the Plan would have moved to the unbranded versions of the identical funds. *Id*., ¶99 (quoting 2018 Auditor Report at 7).

### 2. Lower Cost CITs

Collective investment trusts ("CITs") are lower fee alternatives to institutional share classes of mutual funds. FAC, ¶100. Indeed, fiduciary best practice requires that fiduciaries investigate the availability of lower-cost options like CITs. *Id*., ¶101 (citing "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019). The use of CITs is also endorsed by trust law from which ERISA is derived. The

Restatement (Third) of Trusts § 100 cmt. b(1) states that appropriate funds and comparators may include "suitable common trust funds." *Id*., ¶101.

Here, Defendants failed to timely consider available lower cost, unbranded American CITs that were identical to the MassMutual's CITs. FAC, ¶102. These funds were available on the market since 2014. *Id*. When the Plan finally moved to the CITs in 2017, they had excessive expense ratios due to MassMutual's rebranding strategy. *Id*. The MassMutual version had an expense ratio of .70% while the identical American version had an expense ratio of only .23%. *Id*. Worse yet, because the American CITs had the same underlying investments and investment manager as their mutual fund counterparts, but had lower fees, they generally had greater returns. *Id*. In short, the Plan incurred pointless excess fees due to Defendants' failure to adequately investigate the availability of identical lower cost CITs. *Id*., ¶103.

The failure to move to CITs beginning in at least 2014 is inexplicable because the Plan Document itself permits investing in CITs, meaning Defendants knew or should have known CITs were an option years before the switch was made. FAC, ¶¶102-03 (citing Plan Doc. at 110). Moreover, the Plan had over $560 million dollars invested in the Century TDFs while the minimum eligibility requirement for the CIT version was only $15 million. *Id*., ¶107. From 2014-2018, the Plan had sufficient assets under management during the Class Period to qualify for the cheaper,

unbranded CIT versions of the Plan's MassMutual funds, but Defendants failed to do so. *Id.*, ¶109.

### E.     The Plan's Excessive RKA Fees

The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's recordkeeper. FAC, ¶111. Recordkeeping expenses can either be paid directly from plan assets, or indirectly via higher expense ratios charged by the plan's funds (in this case, the MassMutual branded funds). *Id.* All national recordkeepers for large plans with substantial bargaining power (like the Plan) offer "bundled services" inclusive of an overall suite of essential recordkeeping services as part of a "bundled" fee. *Id.*, ¶¶111-15. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee, because large plan-wide costs can be allocated over a larger participant pool. *Id.*, ¶15. For this reason, most large plans purchase recordkeeping on a "per-participant" fee basis. *Id.*, ¶116. Here, the Plan utilized a revenue-sharing fee structure where the Plan used excessive expense ratios to pay for recordkeeping under the unfounded assumption that it would lower RKA fees. *Id.*, ¶¶117-18.

Further, Defendants could not have conducted an appropriate Request for Proposal ("RFP") at reasonable intervals – or certainly at any time prior to 2014 through the present - to determine whether the Plan could obtain better RKA fee

pricing from other service providers. FAC, ¶120. Prudent plan fiduciaries conduct RFPs at least every three to five years to determine if a plan's RKA fees compare well to similarly situated plans and the general marketplace, especially because the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. *Id.*, ¶119-20 (citing *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011)). Looking at recordkeeping costs for other plans of a similar size in 2019 shows that the Plan was paying higher RKA fees than its peers – an indication that the Plan's fiduciaries failed to appreciate the prevailing market for RKA fees. *Id.*, ¶123.

The Complaint provides five real-world examples of similarly sized plans paying between $22-34 per participant in 2019, while the Plan was paying $60.98. FAC, ¶¶121-23. Additionally, the Complaint alleges that Fidelity, another leading recordkeeper in the marketplace, stipulated in a lawsuit that "if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets ..." *Id.*, ¶¶124-26 (quoting *Moitoso v. FMR*, 451 F.Supp.3d 189, 214 (D. Mass. 2020)). Fidelity's stipulation is persuasive because the Plan's demographics match favorably with the Fidelity plan's demographics, and the time frame is similar to the instant Class Period. FAC, ¶126.

11

Fidelity's Stipulation also corroborates the Complaint's allegations that plan size is the main driver in RKA fees. *Id.*, ¶¶113, 116, 123, 125, 131.

When evaluating recordkeeper compensation, prudent fiduciaries identify all fees, including direct compensation and revenue sharing that is paid to the plan's recordkeeper. FAC, ¶128. The service codes listed in the Plan's Department of Labor annual Form 5500 filings demonstrates that MassMutual was receiving additional fees such as float revenue, soft dollar commissions, investment management fees, and "other investment fees and expenses." *Id.*, ¶129. On the other hand, when Empower took over as the Plan's recordkeeper in 2022, the only service codes on the Form 5500s were for Participant Communication, Float revenue, and Account maintenance fees. *Id.*, ¶130. Without utilizing any of the other service codes that MassMutual claimed, Empower managed to charge a fraction of what MassMutual charged for the same routine bundle of recordkeeping services. *Id.* This further proves that revenue sharing harmed the Plan. *Id.* In totality, based on the Plan's size and the marketplace as a whole, the Plan could have obtained recordkeeping services that were at least comparable, if not superior to the typical services provided by the Plan's recordkeeper at a lower cost.

## IV.    ARGUMENT

### A.    The Plan's RKA Fees Were Excessive

The Plan incurred excessive RKA fees for years, until the Plan belatedly changed its recordkeeper and fee structure in 2022. FAC, ¶130. The Complaint includes five similarly situated plans, the Fidelity Stipulation, and the Plan's own history as comparators demonstrating that the Plan was paying higher than necessary fees. *Id*., ¶¶120-26. Fundamentally, Defendants' incorrect factual interpretations regarding plan comparability (Defs. Mem. at 29), and Defendants' other "argument, that it did in fact employ a prudent process, [] goes to the merits and is misplaced at this early stage." *Sweda*, 923 F.3d at 333. In this Circuit, courts are "not permitted to accept [Defendants'] account of the facts or draw inferences in [their] favor at this stage of litigation." *Id*.; *see also Mator,* 102 F.4th at 178 (same).

### 1.    Defendants' Imprudent Processes

In *Mator*, the Third Circuit agreed with the plaintiffs that "'prudent fiduciaries monitor the amount of revenue sharing' to make sure indirect fees do not become 'unreasonably high.'" *Mator*, 102 F.4th at 182. Also, without using revenue sharing, "'a flat price per participant . . . ensures that the compensation [paid to a recordkeeper] is tied to the actual services provided and does not grow' just because participants have contributed more to their accounts." *Id*. at 179. In the instant case, public information surrounding the Plan's fees compared to the marketplace, and the Plan's subsequent recordkeepers, indicates that the Plan's RKA fees, and its revenue sharing fee structure, went unmonitored by Defendants for far too long. *See* FAC,

¶¶110-31. These circumstantial allegations are routinely upheld as plausibly alleging imprudent fiduciary processes in light of the parties' asymmetrical access to internal plan and fiduciary documents. *See, e.g., Mator,* 102 F.4th at 190 (Plaintiffs "plausibly allege the [recordkeeping and investment] fees were too high overall, it is therefore also plausible that it was a fiduciary breach to cause participants to pay indirect fees by offering mutual fund shares subject to revenue sharing."); *Hughes v. Nw. Univ.*, 63 F.4th 615, 633 (7th Cir. 2023) (*Hughes II*) ("An equally, if not more, plausible inference would be that the university neglected to keep its recordkeeping fees paid through revenue sharing at a reasonable level."); *Perkins v. United Surgical Partners*, No. 23-cv-10375, 2024 WL 1574342, at *3 (5th Cir. Apr. 11, 2024) (same); *Sweda,* 923 F.3d at 330-32 (similar).

Contrary to Defendants' argument, Plaintiffs sufficiently allege that Defendants had imprudent RKA fee monitoring processes. For instance, Defendants claim that "Plaintiffs do not, for example, make allegations that Defendants failed to shop for recordkeepers through Requests for Proposal ("RFPs")." Defs. Mem. at 29. Yet, the Complaint explicitly states that "Because the Plan paid yearly amounts in recordkeeping fees that were well above industry standards each year over the Class Period, there is little to suggest that Defendants conducted an appropriate RFP at reasonable intervals." FAC, ¶¶119-20; *see also Mator,* 102 F.4th at 180 (upholding claims that "the competitive bidding process should be conducted 'at least once

14

every three to five years.' […] Yet Wesco failed to do so."); *Silva v. Evonik Corp.*, No. 20-cv-2202, 2020 WL 12574912, at *7 (D.N.J. Dec. 30, 2020) (similar); *Nicolas v. Trustees of Princeton Univ.*, No. 17-cv-3695, 2017 WL 4455897, at *4 (D.N.J. Sept. 25, 2017) (similar).

Defendants also attempt to pass revenue sharing off as a negotiated "rebate" and a type of "caps" on RKA fees. Defs. Mem. at 29, 35. However, Defendants' misconstructions are contradicted by the Plan's Form 5500 filings in several aspects. First, the expense ratios could not have been effective "rebates" for RKA fees, because the RKA fees under revenue sharing were still higher than market rates (on top of the excessive expense ratios), and the Form 5500s state that MassMutual received additional indirect compensation until 2021. FAC, ¶¶121-31. Second, Defendants could not have prudently engaged in "negotiations" because despite the increasing number of participants, there were several instances of RKA fees *increases* that would not have occurred but-for the Plan's revenue sharing fee structure. *Id*.; *see also Kistler v. Stanley Black & Decker*, Inc., No. 22-cv-966, 2024 WL 3292543, at *20 (D. Conn. July 3, 2024) ("The plaintiffs' claim of excessive RK&A fees is additionally plausible because the plaintiffs allege that the Plan's per-participant RK&A fees did not reduce as the Plan itself grew."); *Mator*, 102 F.4th at 179 (same). Relatedly, Plaintiffs did "acknowledg[e] that total fees were capped" in 2021 and 2022, as Defendants point out (Defs. Mem. at 29), because, as the

15

Complaint explains, Empower, the new recordkeeper, "was charging a reasonable fee" and no indirect compensation was listed on the Form 5500s. FAC, ¶121.

Defendants cite cases holding that negotiations with those plans' existing recordkeeper showed prudence, but the cases are readily distinguishable. For instance, *Braun* was a bench trial decision that occurred after all of the evidence, including non-public plan documents and expert testimony, were evaluated. Here, Defendants have denied Plaintiffs access to similar discovery regarding Defendants' processes. *See* FAC, ¶¶66-67. Also, the outdated and out-of-circuit case in *White v. Chevron Corp.* actually held that "the Plan fiduciaries renegotiated the arrangement to specify a per-participant fee *after just two years* of receiving asset-based revenue-sharing payments…" *White*, No. 16-cv-0793, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (emphasis added). Here it took far longer than two years for Defendants to switch to a more reasonable fee structure and recordkeeper. FAC, ¶121. Put differently, Defendants "merely argue in reply that lowering the recordkeeping fee suggests the fiduciaries were acting prudently." *Moore v. Humana, Inc.*, No. 21-cv-232, 2022 WL 20766504, at *3 (W.D. Ky. Dec. 2, 2022). But "[e]ven if Defendants' contentions are correct, it remains plausible that they engaged in imprudent conduct by not acting earlier." *Peterson*, 2021 WL 1382168, at *4.

## 2.    The Complaint's Plausible Fee Comparisons

Defendants incorrectly assert that, as a matter of law, "Plaintiffs must establish that those 'comparator' plans furnish a 'meaningful benchmark.'" Defs Mem. at 29 (quoting *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1156-57 (10th Cir. 2023), and citing *Krutchen v. Ricoh USA, Inc.*, No. 22-cv-678, 2022 WL 16950264, at *3 (E.D. Pa. Nov. 15, 2022)). *Matney* is from another Circuit, whose pleading requirements are inapplicable here, and the Third Circuit Court of Appeals recently overturned Defendants' cited district court holding in *Kruchten,* because the district court used improper "meaningful benchmark" reasoning. *Kruchten*, 2024 WL 3518308 at **3-4; *see also Binder*, 2024 WL 1096819 at *3 ("While this Court acknowledges that several courts have applied the meaningful benchmark requirement, it also acknowledges that the Court of Appeals for the Third Circuit is not one of them."); *Berkelhammer v. Automatic Data Processing, Inc.*, No. 20-cv-5696, 2022 WL 3593975, at *8 (D.N.J. Aug. 23, 2022) (Defendants comparator arguments were "not persuasive because they primarily contradict[ed] Plaintiffs' pleading or go to the merits of this case."). Nonetheless, Plaintiffs' comparator plans are meaningful comparisons.

### i.    The Comparator Plans

Defendants' criticism that "Plaintiffs had literally hundreds, if not thousands, of plans from which to choose to find a mere five 'comparators'" is contradicted by the Complaint. Defs. Mem. at 36. For example, Plaintiffs allege that in 2022 there

were only 47 plans with 90,000 or more participants, while the Plan had 92,372 participants. FAC, ¶¶14. Defendants are also incorrect as a matter of law, because the *Mator* court recently held that "[d]rawing bright lines would run counter to the required contextual analysis, so we do not adopt any rules limiting comparator size or requiring a specific number of comparators", but nonetheless, "[f]our does not seem insufficient." *Mator,* 102 F.4th at 187. Thus, the Complaint's six instances of comparator plans paying lower fees is sufficient in this Circuit. FAC, ¶¶122-26.

Defendants also attempt to offer an incorrect interpretation of the comparator plans' Form 5500 fee calculations. Defs. Mem. at 30-33. It is true that some of the comparator's Form 5500s checked that they also paid indirect fees, but Plaintiffs' calculations accurately exclude the indirect fees (for the plans that have them), because (1) those forms entered "0" as the amount of indirect fees actually paid, and (2) the service codes related to those indirect fees were not the same as the Plan's indirect fee services codes challenged in the Complaint.[3] Moreover, just looking at the hard dollar payments made by the comparator plans still shows that the Plan

---

[3] Compare FAC, ¶129 (challenging MassMutual's extra compensation codes) with ECF No. 82-6 (in 2019, the Rite Aid Plan did not include indirect fees to its recordkeepers); ECF No. 82-5 (in 2018 the Rite Aid Plan did include indirect fees to its recordkeepers, but did not enter any of the challenged codes that the Plan included, and the amount of indirect fees was entered as "0"); ECF No. 82-1 (the same is true of the Deseret Plan); ECF No. 82-4 (the same is true of the Danaher Corporation plan); ECF No. 82-2 (Dow Chemical also put "0" for the amount of indirect compensation it paid to its recordkeeper, but did enter an amount for indirect compensation paid to a different provider of other, irrelevant services).

overpaid. In 2019, the Plan was paying roughly $44.56 per participant solely in direct payments, meanwhile the *highest* any comparator plan was paying that year was $34. FAC, ¶¶121-123. Thus, "the Plan was already paying too much in direct fees, so if the defendants had been monitoring properly, they would have realized that it was not necessary to allow [the recordkeeper] to collect additional fees [indirectly] through revenue sharing." *Mator*, 102 F.4th at 182 (citations omitted). Defendants also state that "the Rite Aid Plan actually had not one, but two, recordkeepers […] Yet, when Plaintiffs calculate the Plan's recordkeeping expenses, they include only the fees paid to Alight." Defs. Mem. at 32. The Plan only had one recordkeeper, thus only comparing fees to one Rite Aid recordkeeper actually makes the comparison more apt. Moreover, even humoring Defendants' version of Rite Aid's fees of $58.36 in 2018 (Defs. Mem. at 32), still shows the Plan paid more, at $69.93, that same year. FAC, ¶121.

Defendants' calculation arguments are also contrary to Third Circuit precedent. Before Defendants filed their memorandum, the Third Circuit in *Kruchten* reiterated *Mator*'s holding that "plaintiffs will necessarily be limited to calculations based on publicly available data." *Kruchten*, 2024 WL 3518308 at *4 (quoting *Mator*, 102 F.4th at 181). "Accordingly, even while 'allegations [that] are based on incorrect arithmetic ... are not well-pled[,] we must still 'tak[e] into account all of the well-pled facts.'" *Kruchten*, 2024 WL 3518308 at *4 (quoting *Mator*, 102

19

F.4th at 190); *see also Somers v. Cape Cod Healthcare, Inc.*, No. 23-cv-12946, 2024 WL 4008527, at *4 (D. Mass. August 30, 2024) ("the Court does not delve into the parties' differing formulas to determine recordkeeping fees, especially where there remains ambiguity regarding how much Lincoln received through indirect compensation and where Plaintiffs allege that, even after subtracting revenue credit, the Plan's fees remain unreasonable."). Therefore, "any 'initial miscalculation based on lack of information' does not defeat Plaintiff's claim." *Silva*, 2020 WL 12574912, at *6 (quoting *Pinnell v. Teva Pharms. USA, Inc.*, No. 19-cv-5738, 2020 WL 1531870, at *6 (E.D. Pa. Mar. 31, 2020)). Defendant's only legal support is the out-of-circuit motion for summary judgment opinion in *Pizarro v. Home Depot, Inc.*, No. 22-cv-13643, 2024 WL 3633379, at *8 (11th Cir. Aug. 2, 2024). But at that stage, the plaintiffs had access to information that the Plaintiffs do not have here. Importantly, at the motion to dismiss stage, the *Pizzaro* court upheld allegations that, like here, "comparable firms charged lower fees." *Pizarro v. Home Depot, Inc.*, No. 18-cv-01566, 2019 WL 11288656, at *5 (N.D. Ga. Sept. 20, 2019).

Defendants also argue that Fidelity's "stipulation cannot be applied more broadly." Defs. Mem. at 33. To the contrary, Fidelity made the admission as if "the Plan been a third-party plan" negotiating "at arm's length", and based its quote on standard pricing metrics. FAC, ¶125. Many courts find the stipulation relevant to the plausibility analysis. *See, e.g.*, *Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 629

F. Supp. 3d 352, 364 (M.D.N.C. 2022) ("this court finds Plaintiffs' allegation that Fidelity paid recordkeeping fees of $14-$21 does not warrant dismissal."); *Teodosio v. DaVita, Inc.*, 684 F. Supp. 3d 1117, 1127 (D. Colo. 2023) (similar); *McDonald v. Lab'y Corp. of Am. Holdings*, No. 22-cv-680, 2023 WL 4850693, at *6 (M.D.N.C. July 28, 2023) (the stipulation was plausible "because: (1) the Complaint alleges that that recordkeeping fees are set based on plan size; and (2)" that plan was the same size); *Stengl v. L3Harris Techs., Inc.*, No. 22-cv-572, 2023 WL 2633333, at *5 (M.D. Fla. Mar. 24, 2023) (similar). Although Defendants have found some opinions to the contrary, none of them are published like *Garnick* and *Teodosio* or make persuasive arguments.

Defendants argue that if the Plan was paying excessive fees, then Plaintiffs "would have stuck with their original slate of comparators." Defs. Mem. at 36. Actually, it's unremarkable that plaintiffs used updated comparisons in their Complaint rather than the now four years old allegations in the original complaint which used the 401(k) Averages Book. *See* ECF No. 1, at ¶¶ 102-03 (filed December 2, 2020). Critically, *Mator* recently upheld the use of a chart of comparator plans and agreed with other decisions where complaints were "properly dismissed because the plaintiff's only comparators were averages from an industry publication." *Mator*, 102 F.4th at 188. Defendants' disagreement with the original complaints' allegations (Defs. Mem. at 36) is a red herring, because, unlike Defendants' memorandum,

Plaintiffs recognized the holding in *Mator* and amended their Complaint accordingly.

### ii.    The Plan's History

Finally, "Plaintiffs also include another important comparison: the Plan itself." *Moore v. Humana, Inc.*, No. 21-cv-232, 2022 WL 20766504, at *3 (W.D. Ky. Dec. 2, 2022). Plaintiffs allege that "when Empower took over as recordkeeper in 2022," the Plan received a belated reduction in fees and the Plan's Form 5500s no longer listed the extra fee sources that MassMutual was receiving. FAC, ¶130. Defendants' interpretation of the Plan's fee history ignores the Complaint's intertwined, contextual allegations. For example, Defendants argue that "Plaintiffs overstate the amount that the Cognizant Plan paid for its recordkeeping fees" because, as Plaintiffs' intentionally allege, "those amounts include more than just recordkeeping." Defs. Mem. at 34. Actually, Plaintiffs challenge those amounts for being unnecessary, indirect fees. *See* FAC, ¶130. Defendants also prove Plaintiffs' point by stating that the Plan's fees were lowered under a "flat, per-participant recordkeeping fee" structure (which was still higher than the comparator plans). Defs. Mem. at 35; *see also* FAC, ¶¶121-31; *Mator*, 102 F.4th at 179-82. The Complaint alleges that in September of 2018, the Plan moved to the lower cost funds (FAC ¶104 n.10) and recordkeeping fees decreased at the same time the expense ratios decreased (*Id*., ¶121), therefore demonstrating that the revenue sharing fee

structure did not work as a cost-effective "rebate" to lower the plan's fees as Defendants posit.

Further, Defendants disregard the Complaint's interrelated paragraphs to argue that because "the Plan's recordkeeping costs came down each and every year from 2018 to 2022", Defendants were prudent throughout the entire Class Period. Defs. Mem. at 38. Not so. First, the last few years of the Class Period involved a different recordkeeper. *See* FAC, ¶121. Second, the Plan has been growing steadily since 2014, but fees did not steadily decrease to reflect the change in size and bargaining power. *Id*. Third, Defendants point to cases that show a steady decrease in Plan fees from *2014-2017* and *2018*, making those cases distinguishable from the instant case, but-for the fact that they show the Plan's fees should have also experienced steady decreases in those years, but they did not. *See* Defs Mem. at 37 (citing *Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 20-cv-01493, 2021 WL 3417843, at *4 (W.D. Pa. Aug. 3, 2021); *Matney*, 80 F.4th at 1156). In fact, Defendants' own case held that "a high fee may reflect imprudence even if the fee falls year-over-year." *Johnson*, 2021 WL 3417843, at *4. That is the case here, where the Plan's fees decreased by $9 to $60.98 in 2019, but at the same time, the highest fee of the comparator plans was only $34 that year. FAC, ¶¶121-123. Moreover, the Third Circuit recently discredited the improperly heightened pleading standard articulated in *Johnson*. *See Mator*, 102 F.4th at 189 (noting that the district court "quoted

another district judge's opinion [in *Johnson*] that erroneously said 'allegations must cross 'the threshold from possible to *probable*.'").

Ultimately, Plaintiffs have sufficiently alleged that, as a result of Defendants' failure to investigate the Plan's fees and revenue sharing fee structure, the Plan's RKA fees remained excessive until the belated switch to Empower as a recordkeeper. *See, e.g.*, *Mator*, 102 F.4th at 187; *Krutchen*, 2024 WL 3518308, at *4; *Hughes II*, 63 F.4th at 633; *Sweda*, 923 F.3d at 331-32; *Perkins*, 2024 WL 1574342 at *3; *Silva*, 2020 WL 12574912, at *7; *Hay*, 2018 WL 4815558, at *6.

### B.    The Plan's Excessive Investment Fees

"Fiduciaries must … consider a plan's 'power ... to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected.'" *Sweda*, 923 F.3d 328-29 (quoting *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016)). Funds are substantially identical when "the funds 'hold identical investments and have the same manager.'" *Perkins*, 2024 WL 1574342 at *3. Indeed, Plaintiffs allege that the CIT and mutual fund alternatives have identical strategies, "asset allocation and managers" as their mutual fund counterparts. FAC, ¶¶93-95, 103. Again, Plaintiffs plausibly allege that revenue sharing did not justify Defendants' selection and inclusion of the more expensive versions as posited by Defendants. *See, e.g.*, *Mator*, 102 F.4th at 189; *Hughes II*, 63 F.4th at 633.

24

The readily available, cheaper alternative fund versions infer that Defendants could not have been prudently monitoring the Plan's investment options and fees. For example, "during the Class Period, Defendants knew or should have known of the existence of these available CITs and therefore also should have *immediately identified* the prudence of transferring the Plan's funds into these [otherwise identical] alternative investments." FAC, ¶94. Therefore, Plaintiffs neither "focus[] myopically on allegations that the CITs would have been cheaper", nor would Defendants have had to "'scour the market to find the cheapest possible fund possible.'"(Defs. Mem. at 20) (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)). Since *Hecker* was issued, the Seventh Circuit Court of Appeals has clarified that *Hecker*'s "principle does not address the duty of a fiduciary when it has access to a cheaper but otherwise identical fund from the same fund provider." *Hughes II*, 63 F.4th at 625; *see also Lutz v. Kaleida Health*, No. 18-cv-01112, 2019 WL 3556935, at *6 (W.D.N.Y. Aug. 5, 2019) ("The allegations in the Amended Complaint do not support that Defendants would have to 'scour the market' to find and offer these identical funds."); *In re Quest Diagnostics Inc. ERISA Litig.*, No. 20-cv-07936, 2021 WL 1783274, at *3 n.5 (D.N.J. May 4, 2021) (same). Plaintiffs' allegations are plausible because, "[a]lthough reasonable fiduciaries need not prioritize cost minimization above all else, there is enough evidence alleged here of a failure to act prudently." *Mator*, 102 F.4th at 185.

### 1.    Plaintiffs' Standing Regarding the MassMutual Funds

Defendants argue that Plaintiffs do not have Article III standing regarding the MassMutual funds because "Plaintiffs did not invest in the MassMutual funds." Defs. Mem. at 3. Importantly, Defendants do concede that Plaintiffs invested in the Century TDFs which is all that is needed. *Id*. Defendants, once again, fail to acknowledge the Third Circuit precedent that is directly on point here. The Third Circuit in *Boley* reiterated that, "[i]n *Sweda v. University of Pennsylvania* we held that participants in a defined contribution ERISA plan have standing to bring claims alleging the fiduciary's 'process of selecting and managing options must have been flawed' even though the class representatives did not invest in every fund." 36 F.4th at 132 (quoting *Sweda*, 923 F.3d at 331).

Defendants rely on *Thole v. U.S. Bank, N.A.*, 590 U.S. 538, 543 (2020), and *Perelman v. Perelman*, 793 F.3d 368, 373 (3d Cir. 2015). Defs. Mem. at 25. Both cases involved a defined <u>benefit</u> plan rather than a defined <u>contribution</u> plan, like the Plan at issue here. Critically, in *Thole*, *Boley*, and a number of other cases, the courts have held that the plan type at issue was "[o]f decisive importance" to the standing analysis. *Thole*, 140 S. Ct. at 1618; *see also In re Mutual Funds*, 529 F.3d 207, 210 (4th Cir. 2008) (refusing to apply the defendants' proffered defined benefit plan analysis of Article III standing). This is because in a defined contribution plan, as opposed to a defined benefit plan, "'the retirees' benefits are typically tied to the

value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions'" made for the Plan as a whole. *Knudsen v. MetLife Group, Inc.*, No. 23-cv-00426, 2023 WL 4580406, at *4 (D.N.J. July 18, 2023). Hence, "[c]ourts post-*Thole* have generally rejected the argument that a plaintiff's ERISA challenge must be confined to the individual funds in which he or she invested." *McGowan v. Barnabas Health, Inc.*, No. 20-cv-13119, 2021 WL 1399870, at *3 (D.N.J. Apr. 13, 2021) (listing cases); *see also Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 507 (D.N.J. 2021) ("*Thole* suggests ... that a plaintiff has standing to sue on behalf of the Plan, even if that particular plaintiff was not invested in each one of the Plan's [challenged] investment vehicles.").[4]

Here Plaintiffs suffered injuries in the form of the underperformance of the target date funds as well as the excessive RKA fees because of revenue sharing, which intertwines with Plaintiffs' excessive investment management fee allegations. FAC, ¶¶81-85, 118, 129-31, 136. Accordingly, Plaintiffs have Article III standing for all allegations, because they "have alleged an injury to their own investments by virtue of the Fiduciaries' mismanagement, sufficient to create a case or controversy

---

[4] Courts outside of this Circuit agree. *See e.g., Garnick,* 629 F. Supp. 3d at 361 n.3; *Leber v. the Citigroup 401(k) Plan Investment Committee*, 323 F.R.D. 145, 155 (S.D.N.Y. 2017) ("Plaintiffs have standing to assert all of the claims brought in this action even though they did not invest in each of the [challenged] Funds at issue."); *Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, 250 F. Supp. 3d 460, 465 (N.D. Cal. 2017) (same); *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 792 (D. Minn. 2018) (same); *Lopez v. Embry-Riddle Aeronautical Univ., Inc.*, No. 22-cv-1580, 2023 WL 7129858, at *7 (M.D. Fla. July 12, 2023) (same); *Cassell v. Vanderbilt Univ.*, No. 16-cv-2086, 2018 WL 5264640, at *2-3 (M.D. Tenn. Oct. 23, 2018) (similar).

for Article III purposes,' [and so] ERISA 'grants the Participants a cause of action to sue on behalf of the Plan.'" *Luense*, 541 F. Supp. 3d at 506-07 (quoting *McGowan*, 2021 WL 1399870, at *4).

### 2.    The Unbranded Mutual Fund Alternatives

Contrary to Defendants' excuse, the Complaint expressly rules out the possibility that the more expensive mutual funds "provided an *additional* economic benefit to Plan participants." Defs. Mem. at 25-26 (referring to revenue sharing); *see also* FAC, ¶89 ("Several of the prospectuses describe how MassMutual adds fees to each underlying investment with no added benefit."). Defendants incorrectly posit that the funds' net expense ratios after revenue sharing show that Plaintiffs' "approach would have been ***more*** expensive for the Plan." Defs. Mem. at 27. Not so. The Plan actually paid more overall under revenue sharing, because the higher expense ratios did not lower the RKA fees in line with reasonable rates. FAC, ¶92. Hence, Defendants' "net" cost arguments fail when viewing the Complaint holistically.

Rather than addressing the string of Third Circuit cases confirming the Complaint's plausibility, Defendants cite to an Eighth Circuit case that confirms the Complaint's plausibility. *See* Defs. Mem. at 26 (quoting *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir.), *cert. denied*, 574 U.S. 991 (2014)). Defendants are correct that the Eighth Circuit in *Tussey* noted that revenue sharing is legal. *Id*.

Yet, the court also upheld the district court's finding that the defendants "breached their duties to the Plan by failing diligently to investigate Fidelity and monitor Plan recordkeeping costs", including the failure "to (1) calculate the amount the Plan was paying Fidelity for recordkeeping through revenue sharing, (2) determine whether Fidelity's pricing was competitive, (3) adequately leverage the Plan's size to reduce fees." 746 F.3d at 336. Put differently, "just because a revenue-sharing fee arrangement does not amount to a *per se* ERISA violation does not also mean that using such an arrangement in every case fulfills the plan fiduciary's duty of prudence." *Hughes II*, 63 F.4th at 631. "[T]he question is not 'whether a revenue-sharing model is within the range of reasonable choices a fiduciary might make', but whether this revenue sharing arrangement was reasonable under all the circumstances." *Troudt v. Oracle Corp.*, 2017 WL 1100876, at * 2 (D. Col. Mar. 22, 2017).

Defendants ask this Court to improperly assume that "revenue sharing provides an 'obvious, alternative explanation' for why [Defendant chose] share classes of certain funds." Defs. Mem. at 28 (quoting *White v. Chevron Corp.*, No. 16-cv-0793, 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018)). Defendants' cases are unpersuasive because they are from out-of-circuit, outdated, and are materially distinguishable from this case. *Id.* (citing *Boyette v. Montefiore Med. Ctr.*, No. 22-cv-5280, 2023 WL 7612391

(S.D.N.Y. Nov. 13, 2023) and *Rosen v. Prudential Ret. Ins. & Annuity Co.*, No. 15-cv-1839, 2016 WL 7494320, at *11 (D. Conn. Dec. 30, 2016), *aff'd*, 718 F. App'x 3 (2d Cir. 2017)). Relevant here is that *Hughes I*, *Ricoh*, *Krutchen*, *Hughes II*, and *Perkins* each recently held that the mere existence of a revenue sharing fee structure is not an "obvious alternative explanation" warranting dismissal. *See Mator*, 102 F.4th at 190; *Sweda,* 923 F.3d at 332; *Kruchten*, 2024 WL 3518308 at *3; *Hughes II*, 63 F.4th at 631; *Perkins*, 2024 WL 1574342 *3.

Defendants also assert that it is not "surprising that hiring MassMutual would yield such monetary benefits; offering bulk pricing is a keyway for firms like MassMutual to compete and thrive." Defs. Mem. at 28. Plaintiffs agree that MassMutual thrived off of the Plan, but MassMutual's products did not yield any monetary benefits for the Plan. FAC, ¶99. Indeed, failing to select the unbranded version of funds already in the Plan resulted in injuries to the Plan and participants.

### 3.    The Lower Cost CITs

The Complaint alleges that the "identical lower cost American collective trusts […] had the identical asset allocation and managers" as the Plan's MassMutual TDFs. FAC, ¶103. It is undisputed that Defendants were permitted to invest in CITs per the Plan document. *Id*., ¶102. Moreover, Defendants admit that "[u]nlike mutual funds, CITs 'are administered by banks or trust companies' and typically have lower costs given, among other things, their 'simple disclosure requirements.'" Defs.

Mem. at 7. Differences in reporting is Defendants' only argument for why "CITs and mutual funds are very different." Defs. Mem. at 21. Yet, Defendants fail to argue how these reporting requirements are consequential, especially since the reporting differences were not an issue for the governing Plan Document.

Indeed, CITs and their mutual fund counterparts are sufficiently similar at the motion to dismiss stage. *See Nunez v. B. Braun Medical*, No. 20-cv-04195, slip op. at 4 (E.D.PA. June 4, 2021) (denying dismissal of similar allegations because, "[a]lthough the plaintiffs acknowledge that the plan contained at least one collective trust at all times, they argue that this fact alone suggests that the defendants should have been aware of the advantage of collective trusts at the beginning of the Class Period."); *Peterson*, 2021 WL 1382168, at *4 (similar); *Anderson v. Coca-Cola Bottlers' Ass'n*, No. 21-cv-2054, 2022 WL 951218, at *10 (D. Kan. Mar. 30, 2022) (same). The Ninth Circuit in *Davis v. Salesforce.com, Inc.*, also held that "plaintiffs have stated a plausible claim that defendants imprudently failed to select lower-cost share classes or collective investment trusts with substantially identical underlying assets." *Davis*, No. 21-cv-15867, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022). Defendants erroneously cite the overturned district court decision in *Davis*. *See* Defs. Mem. at 21. Likewise, Defendants cite the district court decision in *Matney v. Barrick Gold of N. Am., Inc.,* No. 20-cv-275, 2022 WL 1186532 (D. Utah Apr. 21, 2022) (Defs. Mem. at 21), but on appeal, the Tenth Circuit also "reject[ed] the notion

31

that CITs could *never* be considered comparable to mutual funds." *Matney*, 80 F.4th at 1153 (citing *Hughes I*, 142 S. Ct. at 742; emphasis in original). Lastly, Defendants misconstrue *Cho v. Prudential Ins. Co. of Am.,* No. 19-cv-19886, 2021 WL 4438186 (D.N.J. Sept. 27, 2021) to say that comparing CITs to mutual funds is "fatal in the Third Circuit." Defs. Mem. at 22. Actually, the *Cho* plaintiffs dissimilarly alleged that the plan's CITs were unperforming, not that they were lower cost alternatives. *Cho*, 2021 WL 4438186, at **2, 20. Conversely, *Braun* and *Peterson* are more analogous cases from the Third Circuit.

Defendants argue that Plaintiffs' CIT allegations are "contradicted by specific, factual allegations", because the Complaint alleges that the Plan did switch to the CIT versions in 2017, and in 2018, the Plan switched to the lower cost CIT versions "which Plaintiffs' themselves conceded was prudent." Defs. Mem. at 23. Actually, the Complaint alleges that these switches were too late because the CITs were available *for years*, and by 2017, "***the collective trusts had excessive expense ratios*** because Mass Mutual rebrands available funds from other providers as its own product with the only difference being that the MassMutual product is much more expensive." FAC, ¶102. Also, the 2018 switch was belated, because "the damages to participants' savings were already baked in." *Id*., ¶105 n.10. In this Circuit, courts agree that imprudently delayed changes

to a plan plausibly constitute a breach of prudence. *See Peterson*, 2021 WL 1382168, at \*4; *Nunez*, No. 20-cv-04195 at \*3.[5]

Finally, Plaintiffs allege that "the Plan had sufficient assets under management during the Class Period to qualify for the lower cost American collective trusts." FAC, ¶109. Hence, Defendants' argument that "Plaintiffs fail to allege that the lower cost share class was actually available in 2017 (*i.e.*, that the Plan had sufficient assets to qualify for the shares)" is untrue. Defs. Mem. at 24. Therefore, Defendants' reference to *Johnson v. Parker-Hannifin, Corp.*, No. 21-cv-256, 2023 WL 8374525 (N.D. Ohio Dec. 4, 2023) is misplaced. Additionally, the Complaint alleges that "Minimum initial investment amounts are typically waived for institutional investors like retirement plans." FAC, ¶107. This allegation is deemed plausible by the Third Circuit. *See, e.g., Mator*, 102 F.4th at 182 (upholding allegations that "it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan."); *Sweda*, 923 F.3d at 329 (approving of the same upheld allegations in *Tibble v. Edison Int'l*, 729 F.3d 1110, 1137 n.24 (9th Cir. 2013)). Regardless, Plaintiffs allege the

---

[5] *See also Johnson et al. v. Fujitsu Technology and Business of America, Inc.*, 250 F.Supp.3d 460, 466 (N.D. Cal. Apr. 11, 2017) (upholding allegation of fiduciary's "failing to promptly remove imprudent investments and the target-date funds more broadly when it was apparent that each was imprudent"); *Wildman, et al. v. Am. Century Serv., LLC, et al*, 237 F.Supp.3d 902, 915 (W.D. Mo. 2017) (rejecting argument that "delaying the transfer of Plan assets to a lower-cost share class" does not support an inference of flawed decision-making).

Plan had met the $15 million minimum for investment in the American Century CITs. FAC, ¶107.

There is no prudent reason why the Plan obtained the MassMutual funds when cheaper funds with identical underlying investments and managers were available.

### C.    The Underperforming TDFs

#### 1.    Defendants' Imprudent Processes

The Century TDF suite "underperformed when compared to its benchmarks and peers" from at least 2014 through 2023. FAC, ¶¶79-85. Defendants incorrectly argue that Plaintiffs' allegations do not sufficiently "infer that Defendants' process was imprudent", and that that Plaintiffs are pleading by hindsight. Defs. Mem. at 11, 13. To the contrary, the Complaint alleges that a prudent fiduciary monitoring the fund's performance would have reasonably predicted the funds would continue their pattern of poor performance and switched to any of the many, better performing TDFs before incurring further losses. FAC, ¶¶79-85. Hence, it is not hindsight when "Plaintiffs bring allegations that the Committee failed *for years* to perform sufficient reviews or investigations into the Plan's performance [] it is plausible that Defendants had access to performance data at various points throughout the relevant period, and Plaintiffs' allegation is that Defendants did not adequately consider that information." *Garcia v. Alticor, Inc.*, No. 20-cv-1078, 2021 WL 5537520, at *7 (W.D. Mich. Aug. 9, 2021) (emphasis in original); *see also Muri v. Nat'l Indem. Co.*,

34

No. 17-cv-178, 2018 WL 1054326, at *5–6 (D. Neb. Feb. 26, 2018) (the complaint plausibly alleged a "myriad of 'red flags'" where "a reasonable review process would have uncovered these issues and prompted a prudent fiduciary to remove the Sequoia Fund as a plan option."); *Sellers v. Trustees of Coll.*, No. 22-cv-10912, 2022 WL 17968685, at *22 (D. Mass. Dec. 27, 2022) (same); *Kistler*, 2024 WL 3292543, at *11–12 (similar).

## 2. Plaintiffs Allege Meaningful Comparators

Like all of Defendants' arguments, Defendants rely on outdated or out-of-circuit caselaw by stating that Plaintiffs have not provided "a meaningful benchmark" for their Comparator Funds. Defs. Mem. at 12. As the court in *Binder* recently explained, the Third Circuit does not "appl[y] the meaningful benchmark requirement." 2024 WL 1096819 at *3 (citing *Sweda*, 923 F.3d at 332). Defendants' argument raises issues of fact that require a more developed record. *See Silva*, 2020 WL 12574912, at *6 (quoting *Nicolas*, 2017 WL 4455897, at *5) (a fund's "'apt comparisons' is a question of fact unsuitable for resolution on a motion to dismiss.); *Peterson*, 2021 WL 1382168, at *4 (same); *Nunez*, No. 20-cv-04195 at 2 (same).[6]

---

[6] Outside of this Circuit, courts agree that meaningful comparators are "a dispute that is appropriate to be addressed later in the proceedings, potentially with the aid of expert testimony." *Trauernicht*, 2023 WL 5961651, at *13; *see also Gaines v. BDO USA, LLP*, 663 F. Supp. 3d 821, 829-30 (N.D. Ill. Mar. 21, 2023); *Kohari v. MetLife Grp., Inc.*, 21-cv-6146, 2022 WL 3029328, at *7 (S.D.N.Y. Aug. 1, 2022); *Somers*, 2024 WL 4008527 at *5; *Thomson v. Caesars Holdings Inc.*, 661 F. Supp. 3d 1043, 1057 (D. Nev. 2023).

Nevertheless, Plaintiffs' have alleged meaningful benchmarks. Many courts have held that, like here, underperformance is plausibly alleged when the complaint compares challenged funds to individual funds in the same "Morningstar fund categories benchmarked to the same index." *Russell v. Illinois Tool Works, Inc.*, No. 22-cv-2492, 2024 WL 2892837, at *3 (N.D. Ill. June 10, 2024); *see also Dearing v. IQVIA Inc.*, No. 20-cv-574, 2021 WL 4291171, at *4 (M.D.N.C. Sept. 21, 2021) (same); *Dover*, 563 F. Supp. 3d at 687-88 (same and listing cases); *Gaines*, 663 F. Supp. 3d at 829-30 (same); *Chandra v. Brown-Davis*, No. 19-cv-05392, 2020 WL 8921399, at *1 (N.D. Ill. Mar. 16, 2020) (same); *Snyder v. UnitedHealth Grp., Inc.*, No. 21-cv-1049, 2021 WL 5745852 (D. Minn. Dec. 2, 2021) (same); *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 32 (1st Cir. 2018). Defendants' only case from this Circuit, *Cho*, dismissed the claims because the plaintiffs compared "each of the challenged funds to a single corresponding Vanguard fund." 2021 WL 4438186, at *8. Here, Plaintiffs provide the Morningstar index and six individual funds, thereby resolving the issue of numerosity found in *Cho*. *See also Binder*, 2024 WL 1096819 at *3 (denying dismissal because the challenged funds "underperformed peer comparators, including Vanguard, TIAA, and T. Rowe Price target date funds."). Moreover, Defendants out-of-circuit cases follow an inapplicable standard. For example, Defendants rely on the Eastern District of Missouri case of *Riley v. Olin Corp.*, No. 21-cv-01328, 2023 WL 371872, at *5 (E.D. Mo. Jan. 24, 2023). Yet even

36

courts within the Eighth Circuit have noted its particularly "stringent" standard. *Fitzpatrick v. Nebraska Methodist Health System, Inc.*, No. 23-cv-27, 2023 WL 5105362, at *7 (D. Neb. Aug. 9, 2023).

### 3.    The Degree of Underperformance is Sufficiently Alleged

Despite the Century TDFs' overwhelming and consistent underperformance, Defendants exaggerate isolated instances of their better performance to argue that they performed well overall. Defs. Mem. 14-15. However, Defendants' sparse examples of performance "strength" are demonstrably untrue. For instance, Defendants incorrectly state that the funds performed well in 2015. Defs. Mem. at 15. Actually, almost all comparator funds significantly outperformed the Cognizant fund, with many funds seeing positive returns while the Century TDFs fund saw **negative** returns. *See* FAC, Ex. B. Defendants inaccurately state that "[i]n 2022, the Century TDFs beat the benchmark in all but one vintage." Defs. Mem. at 15. The ***opposite*** is true- the TDFs *underperformed* against the benchmark in all but one vintage, while the Comparator Funds overwhelmingly outperformed the Century TDFs. *See* FAC, Ex. I. This also means that Defendants wrongly state that the Century TDFs "trounced the benchmark every year that the benchmark was down, *i.e.*, 2015, 2018, and 2022 […]" thereby demonstrating a better risk strategy. Defs. Mem. at 16.

Defendants ignore the 2016, 2017, 2019, 2021, and 2023 data, which accounts for five years out of roughly eight years of the Class Period.[7] In total, each year of the Class Period demonstrates underperformance. Conversely, during the same period, the funds in *Antoine v. Marsh & McLennan Companies, Inc.,* (cited in Defs. Mem. at 16), experienced "an upswing in rankings […] in 2021 and 2022", making Defendants' case inapplicable. *Antoine*, No. 22-cv-6637, 2023 WL 6386005, at *11 (S.D.N.Y. Sept. 30, 2023). Likewise, the nearly ten years of underperformance data present here provides more than the "snapshot" discredited in *Pizarro's* summary judgment holding. Defs. Mem. at 16 (citing *Pizarro*, 2024 WL 3633379). On the other hand, at the relevant motion to dismiss stage, the court in *Pizzaro* upheld Plaintiffs' allegations regarding the plan's "chronically poor performing investments when there were better investments available." *Pizarro*, 2019 WL 11288656, at *3. At most, *Pizarro* confirms the degree of underperformance is fact determination best left for later stages of the case. Indeed, that is the law in this Circuit. *See, e.g., Berkelhammer*, 2022 WL 3593975, at *8 (citing *Sweda*, 923 F.3d at 333) ("[w]hether underperformance is modest and short in duration raise factual questions that should

_____

[7] In 2016, the benchmark significantly outperformed the Century TDFs in all vintages, with all comparator funds outperforming the Century TDFs apart from one fund in one vintage. *See* FAC, Ex. C. In 2017, the Century TDFs underperformed the benchmark at every vintage, and there were only three out of 52 total comparisons where a comparator fund performed worse than the Century TDFs. *See* FAC, Ex. D; *see also* FAC, Exs. F, H and J (demonstrating that the years 2019, 2021, and 2023 had similar results).

be tested through discovery, not summarily decided at the motion-to-dismiss stage."); *Binder*, 2024 WL 1096819 at *3 ("three-year trailing performance" was sufficient to allege sustained underperformance). Although *Cho* may have held differently, (Defs. Mem. at 18), *Berkelhammer* and *Binder* are more persuasive, because they were decided after the Supreme Court issued *Hughes I,* reaffirming ERISA's plausibility standard.

Defendants point to the out-of-circuit case in *Bekker v. Neuberger Berman Grp. LLC*, but that case was not dismissed based on the degree of underperformance, it was because the comparator funds were too "distinct." *Bekker*, No. 16-cv-6123, 2018 WL 4636841, at *7 (S.D.N.Y. Sept. 27, 2018). Also, Defendants cite the recent *Kistler* decision, which actually supports *denying* dismissal. Defs. Mem. at 19. *Kistler* held that although "[u]nderperformance to the degree shown above is not necessarily substantial enough to render the fiduciaries' retention of the BlackRock TDFs *per se* imprudent [,] […]the plaintiffs have plausibly alleged that the BlackRock TDFs' underperformance should have at the very least captured the attention of a prudent fiduciary." 2024 WL 3292543, at *11–12. Other courts agree with *Kistler*. *See, e.g.*, *Trauernicht*, 2023 WL 5961651, at *12 (eight periods of underperformance created a plausible "allegation of sustained underperformance ..."); *Miller v. Astellas US LLC*, No. 20-cv-3882, 2021 WL 1387948, at *6 (N.D. Ill. Apr. 13, 2021) (similar); *Muri*, 2018 WL 1054326, at **5–6 (investment imprudence

was sufficiently plausible based on multiple unheeded "red flags"); *Sellers*, 2022 WL 17968685, at *22 (same). Despite Defendants' poor attempt to spin the facts and law, Plaintiffs have plausibly alleged that Defendants' imprudent processes enabled the underperforming funds to languish in the Plan.

### D.     Plaintiffs' Derivative Duty to Monitor Claim

Defendants' arguments for dismissing Plaintiffs' duty to monitor claim ignores unequivocal Third Circuit precedent. Recently, both parties and the Third Circuit in *Mator* "agree[d] the failure to monitor claim derives from the primary claim of breach of the duty of prudence" and therefore survives with the underlying breaches. 102 F.4th at 191; *see also Binder*, 2024 WL 1096819 at *5 (same); *Berkelhammer*, 2022 WL 3593975, at *19 (same); *Boley*, 36 F.4th at 132 (a monitoring claim "incorporates the factual allegations supporting the three claims in Count I…" for standing purposes). Hence, it is sufficient that Plaintiffs plausibly alleged the underlying breaches of fiduciary duty of prudence in Count I.

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss Plaintiffs' First Amended Class Action Complaint, or in the alternative grant Plaintiffs leave to amend.

Dated:  September 16, 2024          Respectfully submitted,

                                    **CAPOZZI ADLER, P.C.**

40

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
Attorney ID No. 88587
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Fax (717) 233-4103
Email: markg@capozziadler.com

*Counsel for Plaintiffs and
the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 16, 2024 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: <u>*/s/ Mark K. Gyandoh*</u>
Mark K. Gyandoh, Esq.
