UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARK MILANO et al., | No. 20-cv-17793 (MEF)(SDA) |
| *Plaintiffs*, |  |
| v. | **OPINION and ORDER** |
| COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION et al., |  |
| *Defendants*. |  |

\* \* \*

For the purpose of this Opinion and Order, the Court largely assumes familiarity with the facts and procedural history of this case.

\* \* \*

The employees of a particular company[1] were given the opportunity to invest in a retirement plan ("the Plan").[2] See First Amended Class Action Complaint ("Complaint") (ECF 73) ¶¶ 22-27; see also id. ¶ 28.

Within the Plan were various funds. See id. ¶¶ 59-60. A fund designed for those planning to retire in 2025, for example. See id. ¶¶ 22, 25, 27. And one set up for people looking to stop working in 2040. See id. ¶ 24. Or 2050. See id. ¶ 26.

---

[1] Cognizant Technology Solutions U.S. Corporation.

[2] The Plan is a defined contribution plan. See Complaint ¶ 51.

Certain company employees[3] invested in a sub-set of these Plan funds. See id. ¶¶ 22-27. And in connection with their investments, those employees had to pay "recordkeeping and administrative fees."[4] See id. ¶¶ 16, 110.

But the company employees came to believe that there was a problem: the fees they were being charged were too high. See id. ¶¶ 16, 28.

And so too were the fees being charged to other company employees --- who seem to have been invested in other funds under the umbrella of the same overarching company retirement Plan. See id. ¶ 16; id. ¶ 135 (referring to the "recordkeeping expenses of the Plan" as a whole).[5]

To the employees, the high fees (plus other things) suggested that the entity entrusted with running the retirement Plan,[6] see id. ¶¶ 40, 133, was not handling things in the right way. See id. ¶¶ 135-36.

So the employees sued.

---

[3] Mark Milano, Robert Cameron, Rodney Hergenrader, Katherine H. Joncas, and Charles Van Hooser.

[4] Administering a retirement plan requires "recordkeeping," which typically involves, among other things, "track[ing] the balances of individual accounts, provid[ing] regular account statements, and offer[ing] informational and accessibility services to participants." Hughes v. Northwestern Univ., 595 U.S. 170, 174 (2022); see also Complaint ¶ 111. This is specialized work, and retirement plan sponsors generally hire third parties to take care of it. See U.S. Gov't Accountability Office, GAO-12-325, 401(k) Plans: Increased Education Outreach and Broader Oversight May Help Reduce Plan Fees 1 n.2 (2012). Third-party administrators need to get paid, and the fees that they charge vary.

[5] For a qualifier, see footnote 10.

[6] The 401(k) Investment Committee of Cognizant Technology Solutions U.S. Corporation.

From here, the employees are called "the Plaintiffs"[7] and the entity responsible for investing Plan assets, see id. ¶ 37, is "the Defendant."[8]

\*   \*   \*

The Plaintiffs sued under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.[9]

ERISA requires certain retirement-plan managers to act as fiduciaries. See 29 U.S.C. § 1002(21)(A); Renfro v. Unisys Corp., 671 F.3d 314, 321 (3d Cir. 2011). And fiduciaries need to act prudently. See 29 U.S.C. § 1104(a)(1)(B); Sweda v. Univ. of Pa., 923 F.3d 320, 327-28 (3d Cir. 2019).

The Plaintiffs claim that the Defendant was obligated to manage the Plan as a fiduciary, see Complaint ¶¶ 133-34, but that its management was not prudent. See id. ¶ 135.

How so?

In part because, the argument goes, the Defendant permitted fees that were too high to be charged to people invested in various funds within the Plan. See Complaint ¶ 110. The Defendant "failed to control the administrative and recordkeeping expenses of the Plan," id. ¶ 135, and this left the Plaintiffs "saddled . . . with above-market recordkeeping fees." Id. ¶ 118.

The Plaintiffs seemingly invoke the allegedly too-high fees charged in (1) Plan funds they themselves were invested in, and (2) Plan funds that they themselves were not invested in --- but that other people were.[10]

---

[7] Recall: Mark Milano, Robert Cameron, Rodney Hergenrader, Katherine H. Joncas, and Charles Van Hooser.

[8] Recall: the 401(k) Investment Committee of Cognizant Technology Solutions U.S. Corporation.

[9] The focus of this Opinion and Order is only on count one of the Plaintiffs' lawsuit. See Complaint ¶¶ 132-38. Count two presses another claim. See id. ¶¶ 139-145. And it names other defendants. See id.

[10] This looks to be the best reading of the complaint. See, e.g., Complaint ¶ 16 (alleging that the Defendant "breached the duties [it] owed to the Plan, to [the] Plaintiffs, and to the other participants in the Plan by . . . failing to control the Plan's recordkeeping [fees]"); id. ¶ 121 (relying on "the Plan's

3

The question on the table: do the Plaintiffs have standing under Article III of the Constitution to press their count-one ERISA claim to the extent it is based in part[11] on the fees associated with Plan funds the Plaintiffs did not invest in?[12]

---

per participant administrative and recordkeeping fees"); id. ¶¶ 135-36 (alleging that, had the Defendant not "failed to control the administrative and recordkeeping expenses of the Plan," "the Plan's participants would have had more money available to them for their retirement"). But if the Plaintiffs mean to be pressing imprudence allegations based only on fees charged in Plan funds that they themselves were invested in, while they were invested in them --- they should so clarify.

[11] "In part" because the count-one ERISA claim is apparently cumulative --- it is based on the idea that various choices made by the Defendant together add up to unlawful imprudence. Some of the complained-of choices relate to fees. See Complaint ¶ 135. Others do not. See id. And as noted, some of the Defendant's alleged fee-related choices seem to concern Plan funds in which the Plaintiffs were invested, while others do not. In short, only a slice of the Plaintiffs' overall imprudence claim is impacted by a possible Article III standing issue. But that slice needs accounting for before getting to the overall merits of the case. This is because the Plaintiffs have opted to press their imprudence claim on a holistic, all-packaged-together basis. None of the Defendant's allegedly imprudent choices stand alone, in their own, free-standing ERISA counts; rather, each choice is treated by the complaint as part of a single overarching ERISA violation, with each choice tallying up, on a cumulative basis, to imprudence. See id. ¶¶ 135-36; see generally Mator v. Wesco Distrib. Inc., 102 F.4th 172, 190 (3d Cir. 2024) (suggesting that duty-of-prudence claims must be evaluated on a "'holistic'" basis); Sweda, 923 F.3d at 331 (same). It makes little sense to evaluate a claim put together in this way without first knowing what it consists of. If the question on the table is whether someone spent $10 on a bag of groceries, there is no point in answering until we know what items to actually count up --- three apples, a dozen eggs, and a quart of milk, or that same mix of things, but minus the eggs.

[12] The parties have not spoken to whether the Plaintiffs have standing as to the particular question referenced in the text. But raising this issue, even if the parties have not, is the

\*   \*   \*

To begin to answer, start with some background.

Roughly speaking, there are two basic ways that retirement-plan recordkeeping fees are paid for.  See Hughes, 595 U.S. at 174 (describing these); Mator v. Wesco Distrib. Inc., 102 F.4th 172, 179 (3d Cir. 2024) (same); see also Sarah Holden, Alex Johnson, & Elena B. Chism, The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2023, ICI Rsch. Persp. (July 2024), at 6, https://www.ici.org/system/files/2024-07/per30-06.pdf (same).

The first is the direct fee model.

Its defining feature: "paying for plan-level recordkeeping services directly from participant accounts."  Holden, Johnson, & Chism, Economics of Providing 401(k) Plans, at 6 (emphasis added).

The direct fees imposed can vary from plan-participant to plan-participant.  For example, the direct fee might be charged based on how much each participant has invested in the retirement plan.  See Dominique C. Badoer, Charles P. Costello & Christopher M. James, I Can See Clearly Now: The Impact of Disclosure Requirements on 401(k) Fees, 136 J. Fin. Econ. 471, 474 (2020).

But "typically," the direct fee model involves all participants in an overall retirement plan paying roughly the same "fixed" amount, regardless of the particular funds within the retirement plan they are invested in.  See Veronika K. Pool, Clemens Sialm & Irina Stefanescu, Mutual Fund Revenue Sharing in 401(k) Plans 9 (Nat'l Bureau of Econ. Rsch., Working Paper No. 30721, 2011); see also Hughes, 595 U.S. at 174; Sweda, 923 F.3d at 324.

The second model is the indirect fee model.

Under this model, administrative expenses are paid without any "direct charge to either the employer or plan participant."  Lauren K. Valastro, How Misapplying Twombly Erodes Retirement Funds, 32 Geo. Mason L. Rev. 421, 433 (2025); see also Ian Ayres & Quinn Curtis, Beyond Diversification: The Pervasive Problem of

---

Court's obligation.  See, e.g., Boley v. Universal Health Servs., Inc., 36 F.4th 124, 130 (3d Cir. 2022).

Excessive Fees and "Dominated Funds" in 401(k) Plans, 124 Yale L.J. 1476, 1486 (2015).

How does this work?

Recordkeeping is typically paid for by means of "rebates" passed upstream --- from individual funds up to the entity doing the administrative work.  See Pool, Sialm & Stefanescu, Mutual Fund Revenue Sharing, Nat'l Bureau of Econ. Rsch. at 1; Badoer, Costello & James, I Can See Clearly Now, 136 J. Fin. Econ. at 474.

Passing "rebates" up the chain is generally called "revenue sharing."  See Pool, Sialm & Stefanescu, Mutual Fund Revenue Sharing, Nat'l Bureau of Econ. Rsch. at at 1, 3; Ayres & Curtis, Beyond Diversification, 124 Yale L.J. at 1486.

And revenue-sharing of this sort typically (but not necessarily) works on a variable and non-uniform basis --- that is, with participants in an overall retirement plan required to pay somewhat different amounts (or at least based on roughly different formulas), based to an extent on the particular funds within the retirement plan they are invested in.

Under a revenue-sharing arrangement, fees are "expressed through an 'expense ratio': a percentage of the plan participant's total assets invested."  See Valastro, Retirement Funds, 32 Geo. Mason L. Rev. at 433; Pool, Sialm & Stefanescu, Mutual Fund Revenue Sharing, Nat'l Bureau of Econ. Rsch. at 9.

And the expense ratios can "differ substantially across [investment] options."  See Pool, Sialm & Stefanescu, Mutual Fund Revenue Sharing, Nat'l Bureau of Econ. Rsch. at 9; see also Valastro, Retirement Funds, 32 Geo. Mason L. Rev. at 433.

Bottom line: retirement plan recordkeeping fees are generally covered either on (1) a direct basis, in which case the fees are often (but not necessarily) uniform --- that is, imposed without regard to the fund in which a plan participant is invested in; or (2) on an indirect basis, in which case the fees are often (but not necessarily) non-uniform --- that is, varying to an extent depending on the particular funds within a retirement plan that a plan participant is invested in.

*   *   *

Why might all of this matter here for Article III standing?

6

The reason is this: in count one of their complaint, the Plaintiffs contend, among other things, that the Defendant breached their ERISA duty of prudence by permitting administrative fees to be charged that were too high.  See Complaint ¶ 135.

In support of this claim, the Plaintiffs seemingly[13] invoke fees paid by participants in a wide range of Plan funds.

But the Plaintiffs were invested in only three Plan funds.  See Complaint ¶¶ 22-27.  And there seem to have been many more Plan funds than that.[14]

Do the Plaintiffs plausibly have Article III standing to press an imprudence claim that is based, in part, on the allegedly too-high administrative fees that were charged by the Plan as to funds that the Plaintiffs were not, themselves, invested in?

As a legal matter, the answer may well turn on whether fee expenses were covered (a) on a uniform basis across the Plan --- that is, regardless of the particular funds Plan participants were invested in (as is often the case under the direct fee model) or (b) on a dis-uniform basis --- that is, depending on the particular funds Plan participants were invested in (as is often the case under the indirect fee model).

In the first situation, (a), there is almost surely standing for now.  See Boley v. Universal Health Servs., Inc., 36 F.4th 124, 131 (3d Cir. 2022).

---

[13]  See footnote 10.

[14]  The menu of investment options that appears to have been available to Plan participants is more than forty pages long and lists out more than fifty funds per page.  See Complaint, Exhibit K ("Exhibit K") (ECF 73-11).  And the parties seem to proceed on the assumption that there were available funds in the Plan that the Plaintiffs were never invested in.  See Letter from Mark K. Gyandoh (ECF 96) at 1 (acknowledging that the Plaintiffs "did not necessarily invest in the MassMutual funds"); Letter from Bryan Nese (ECF 98) at 1 ("Plaintiffs concede that they did not invest in the five MassMutual funds they challenge."); footnote 10.

7

In the second situation, (b), the question is closer. See, e.g., Collins v. Ne. Grocery, Inc., 149 F.4th 163, 173-74 (2d Cir. 2025).

But before getting to the legal landscape, note that the information put before the Court to this point is, simply, difficult to get to the bottom of. It is not entirely clear as a factual matter whether this is a first situation case (covered by Boley) or a second situation case (potentially covered by Collins).

\*   \*   \*

As to the facts, start by noting that, per the materials put before the Court, payment for recordkeeping fees seems potentially to have been handled differently before and after September 2018 --- with a direct-fee model after September 2018 and an indirect-fee model before September 2018.

As to the post-September 2018 period, things are easier to follow.

According to the Defendant, in September 2018, the Plan "switched to a flat, per-participant recordkeeping fee." Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Complaint ("Defendants' Brief") (ECF 81) at 8-9.

And, per the Defendant again, in September 2018, the flat fee was $42 per participant. See id. Later, in 2019, that fee dropped, first to $26 per participant, and then to $23 per participant. See id. at 9.

The key point: from September 2018 forward, it looks like the fees were apparently the same for all participants in the Plan, regardless of the particular Plan funds they were invested in.

And in their briefing, the Plaintiffs seem to accept this timeline. See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint (ECF 85) at 22-23.[15]

---

[15] As noted, courts have sua sponte obligations to notice and resolve standing difficulties. And what a plaintiff must do to establish standing varies depending on the stage of the case. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). At some point, if not now, certain factual complexities may well need to be addressed. In particular, the Defendant indicates

But before September 2018, fees look like they may well have been covered on a non-uniform basis --- with payments by Plan participants depending to an extent on the particular Plan funds in which they were invested.

Per the Defendant, before September 2018, the Plan relied on a "revenue sharing arrangement."  See Defendants' Brief at 8.

As discussed above, revenue sharing often means some non-uniformity in how retirement-plan fees are covered.

And it looks like there may have been that sort of non-uniformity here.

A particular document put before the Court is a copy of the menu of investment options that were available to participants in the Plan.  See Exhibit K.  And according to the just-referenced document, as to some Plan funds, there appears to have been no revenue sharing.  See, e.g., id. at 1 (listing investment options with 0.00% revenue sharing).[16]  But as to other Plan

---

that the Plan moved to the "flat, per-participant" model in September 2018.  See Defendants' Brief at 8-9.  (As discussed below, the Plan had apparently relied before September 2018 on a revenue sharing model.  See id.)  But the document that sets forth the revenue sharing associated with each investment option seems to be dated to November 2018, after revenue sharing purportedly ceased.  See Exhibit K.  Other materials deepen the uncertainty about the timeline here.  See Declaration of Melissa D. Hill, Exhibit 5 (ECF 17-5) at 10 (2019 fee disclosure referring to administrative fees "paid through revenue sharing arrangements"); Declaration of Melissa D. Hill, Exhibit 6 (ECF 17-6) at 11 (2020 fee disclosure using the same language); Declaration of Alex Lakatos, Exhibit 7 ("Exhibit 7") (ECF 82-7) at 35, 49 (indicating that the recordkeeper received "indirect compensation" in 2020 and 2022).

[16]  Those funds with 0.00% revenue sharing may be particularly important here.  The Plaintiffs were allegedly invested in three American Century One Choice target-date funds.  See Complaint ¶¶ 22-27.  And the menu of investment options appears to include American Century Target Date funds from the relevant vintages, that involved 0.00% revenue sharing.  See Exhibit K at 26.  But if the Plaintiffs were not paying anything in recordkeeping fees during the pre-September 2018 period, would they have Article

9

funds, revenue sharing reached as high as 1.60%.  See id. at 4, 17, 35.

This seems to suggest non-uniformity.[17]

In a nutshell: while the parties have not provided a detailed account of the underlying facts here, the Court's tentative[18] sense is that during the time covered by the complaint (from 2014 forward),[19] the allegations are of a later period of seemingly uniform fee payments by Plan participants (starting in around September 2018) and an earlier period of seemingly non-uniform fee payments by Plan participants.

Why this overall picture matters is unpacked just below.

\*   \*   \*

If fees were covered on a uniform basis across the funds in the Plan, then, as to the time period when that was the case, the Plaintiffs likely have Article III standing to press an imprudence argument against the Defendant based on too-high fees --- even as to Plan funds the Plaintiffs were not themselves invested in.

For that period,[20] the Third Circuit's decision in Boley is likely dispositive.

The Boley opinion described the retirement plan at issue as having charged "each Plan participant a flat annual

---

III standing to bring a challenge based in part on recordkeeping fees charged during that time period?

[17] Or does it?  The Defendant indicates that "MassMutual credited back a portion of fees received to participant accounts to offset administrative expenses, such as recordkeeping expenses."  Defendants' Brief at 8.  This is also reflected in language contained in at least some of the pre-September 2018 fee disclosures.  See Declaration of Melissa D. Hill, Exhibit 8 (ECF 17-8) at 13.  This might be a surface indication of "fee levelization" at work.  See Lucas v. MGM Resorts Int'l, 724 F. Supp. 3d 1142, 1148 (D. Nev. 2024).  But there is no real detail on any of any of this in the materials put before the Court.

[18] "Tentative" because the Court has too little to go on here, and what there is is elusive.

[19] See Complaint ¶ 10 (defining the class period).

[20] Seemingly: from around the fall of 2018 forward.

10

recordkeeping and administrative fee." Boley, 36 F.4th at 131. And the court of appeals therefore held that an "allegedly excessive annual fee would represent a concrete and personal injury to a plaintiff regardless of the funds in which he or she invested." Id. at 131.[21]

But if fees were covered on a non-uniform basis across the funds in the Plan, then, as to the time period when that was the case,[22] do the Plaintiffs have standing to press an imprudence argument based in part on too-high fees --- even as to Plan funds the Plaintiffs were not themselves invested in?

A number of cases suggest the answer may potentially be "no." The main one is the Second Circuit's recent decision in Collins v. Northeast Grocery, Inc. See 149 F.4th at 173-74 (no standing where the complaint "identified only one fund" with allegedly improper revenue sharing, but there was no allegation that any plaintiff was invested in either that fund or any other funds with revenue sharing arrangements).

And there are other cases, too, that might well be read that way. Look to, for example, Lopez v. Embry-Riddle Aeronautical Univ., Inc., 2024 WL 4769632, at *7 (M.D. Fla. Nov. 13, 2024); Sabana v. CoreLogic, Inc., 2024 WL 755723, at *4 (C.D. Cal. Jan. 26, 2024); and O'Driscoll v. Plexus Corp., 2022 WL 3600824, at *4 (E.D. Wis. Aug. 23, 2022).

---

[21] The underlying complaint in Boley may cast some doubt on whether the retirement plan in that case actually involved a uniform, across-the-plan recordkeeping fee. See Class Action Complaint ¶ 95 ("A more prudent arrangement in this case would have been . . . for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees."), Boley v. Universal Health Servs., Inc., 337 F.R.D. 626 (E.D. Pa. 2021). Whether that is or is not relevant for properly understanding Boley is an issue for another day. And note also: Boley involved appellate review of a case that was at the class certification stage. See Boley, 36 F.4th at 129-30. That "several broader failures . . . affecting multiple funds in the same way" were enough for standing in Boley at the class certification stage, see id. at 132, may or may not be enough to establish standing at other stages of a case. See Lujan, 504 U.S. at 561.

[22] Seemingly: before the fall of 2018.

11

But the Court does not have the benefit of the parties' read on these cases about non-uniform fees. They have not been cited in the parties' legal papers (and Collins came down after the briefing in this case was filed).

\*   \*   \*

There is, in short, a possible Article III standing issue with an aspect of the Plaintiffs' count-one ERISA claim.

And the standing issue cannot be tackled by the Court now.

First, its resolution depends on factual information that is too sparse and too opaque to reliably work through at this point.

And second, its resolution depends on an assessment of the legal implications of the underlying facts --- but the key legal authorities have not been addressed by the parties.

Until the Article III standing questions here are worked out, there is no way to thoughtfully resolve the Defendant's motion to dismiss. See footnote 11.

Against this backdrop, the Court will proceed as follows.

The parties shall each file a letter of no more than two pages on or before November 5 indicating how they wish to proceed. Is new briefing required? Will the Plaintiffs seek to replead? Etc.

Meanwhile, the Court will (and hereby does) deny for now, without prejudice, the motion to dismiss at ECF 80. This will allow the Defendant to refile a motion to dismiss later, as it may wish to, that responds to new developments in this case that may follow from resolution of the standing issue.[23]

\*   \*   \*

IT IS on this 27th day of October, 2025, **SO ORDERED.**

_____
Michael E. Farbiarz, U.S.D.J.

---

[23] And if, down the road, the Defendant does not want to revise its motion to dismiss, it can request permission from the Court to simply revive it, without need of a new filing.

12